**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Earl KNIPPENBERG, Defendant-Appellant.**

**No. 73-2031.**

United States Court of Appeals, Seventh Circuit.

Argued March 1, 1974.

Decided Aug. 15, 1974.

Rehearing Denied Dec. 30, 1974.

Sherman C. Magidson, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Ann C. Tighe, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, CUMMINGS and PELL, Circuit Judges.

FAIRCHILD, Circuit Judge.

Earl Knippenberg appeals from a judgment upon conviction of seven counts of mail fraud, 18 U.S.C. § 1341, and of one count of transporting stolen securities in interstate commerce. 18 U.S.C. § 2314.

Defendant's principal argument is that the evidence was insufficient to establish guilt. We agree with him as to the seven mail fraud counts, but disagree as to the eighth, transportation count.

### 1. *The seven mail fraud counts.*

The indictment charged in the first seven counts that Jack R. Walsh, George Witchek, and defendant Knippenberg devised a scheme to defraud, and that in order to execute the scheme, they caused matter to be mailed on six occasions in July, 1972, and on August 3, 1972. Walsh pleaded guilty, and was a witness at Knippenberg's trial. Witcheck was a fugitive.

David Valente owned parcels of real estate near Bethlehem, Pennsylvania. The scheme, according to the indictment, was that Walsh would falsely represent to Valente, the Northampton National Bank, Easton, Pennsylvania, and others, that Walsh was a vice president of Seay & Thomas Inc., a well known Chicago company and that Seay & Thomas would provide mortgage financing on Valente properties in the amount of $1,000,000; that defendants would induce Northampton Bank to provide interim financing; that defendants would induce Northampton Bank on August 18, 1972 to issue four cashier's checks, totalling $25,200, payable to creditors of Valente, and falsely represent they would deliver these checks to Valente's attorney, O'Hare, for delivery to the payees, but that defendants would transport these checks to Chicago, provide forged endorsements, and convert the proceeds;[1] that defendants would induce Northampton Bank to issue a cashier's check August 18 for $2,500 to Knippenberg; that defendants would falsely represent to Northampton Bank that Seay & Thomas would deposit funds in an account in the bank, out of which the bank would be reimbursed the $27,700.

There was ample evidence tending to show that Walsh, a resident of Chicago, went to Pennsylvania, and devised and carried out a scheme as alleged; that although the mailings which were the subject of the first seven counts were accomplished by others, presumably innocent of the fraud, the mailings were reasonably foreseeable in the ordinary course of business in execution of the scheme; that Knippenberg who had had business associations with Walsh in Chicago, went to Pennsylvania; performed ostensibly legitimate tasks in connection with the Valente project; was with Walsh and those being duped by Walsh on one or more occasions as early as July 7; and that as early as about two weeks before August 18 he joined in misrepresentations which advanced the scheme or at least stayed silent while Walsh made representations which Knippenberg must have known were false. The problem is that all the mailings which form the substantive offenses in the first seven counts occurred in July or on August 3. Only the last date even approximates the time when the evidence tends to show Knippenberg's first participation in conduct furthering the scheme with knowledge that fraud was involved. Was the evidence consistent with Knippenberg being a dupe, like Teeman, until about August 4, or would

---

1. The transportation of these checks was the subject of count 8.

it suffice to prove that Knippenberg was a knowing participant in the fraud from July 7 on?

Valente owned a number of valuable, but heavily encumbered parcels of real estate. He had retained Attorney O'Hare, and was a customer of Northampton Bank. In spring, 1972, Walsh falsely told Valente Walsh was associated with Seay & Thomas. He obtained the apparently innocent assistance of Louis Teeman who was actually an employee of Seay & Thomas and by his presence on several occasions and interest in the development of Valente's properties unwittingly lent some color to Walsh's claim.

When Walsh contacted Knippenberg in June about the Valente project, Knippenberg had been operating a small construction business, apparently in financial difficulty. He had worked for Walsh before on seemingly legitimate projects and testified that he accepted Walsh's offer of work on a construction job in Pennsylvania. Knippenberg was present, as was Teeman, on July 7 at the Northampton Bank, with Walsh and Sechler, the bank vice president. There was testimony that Knippenberg was doing some preliminary tasks in preparation for construction work on Valente's properties, and no proof that his efforts in the early weeks were not genuine. On or after July 27, Walsh introduced Knippenberg to O'Hare as one who was in the area to work on the Valente project. There is testimony that Walsh said that Knippenberg and another were "the people who will be working from the extra office that you gave us on the Valente project on behalf of World Wide Builders and Seay & Thomas." Since Knippenberg ordinarily did business under the name of World Wide Builders, and another person was also referred to, his failure to protest that he had no connection with Seay & Thomas could not establish beyond a reasonable doubt that he was a knowledgeable par-

ticipant in the fraud as early as July 27.

The testimony which described the earliest activity on the part of Knippenberg which could be found beyond a reasonable doubt to be fraudulent was that about two weeks before August 18, Sechler, Walsh, and Knippenberg had a conversation during which Walsh said that World Wide Builders had a standing relationship with Seay & Thomas and often worked for that firm. The statement was false and known to Knippenberg to be so, yet he did not correct it. Up to this time Knippenberg's conduct, like Teeman's, may as well, from the evidence, have been legitimately as fraudulently motivated. Exactly two weeks before August 18 would have been August 4, one day after the last mailing, charged in Count 7. This and other testimony to be referred to in discussing count 8, form an adequate basis for a finding that by approximately August 4, Knippenberg joined Walsh in a conspiracy to carry out the scheme described in the indictment, but that proof is not a sufficient predicate for a finding that he caused the mailings on earlier dates.

Although joining a conspiracy subjects the late joiner to some of the consequences of earlier activity by others in furtherance of the conspiracy, and conspiracy principles apply to a multi-member mail fraud scheme, whether or not conspiracy has been formally charged,[2] it is our opinion that an individual "cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy. . . ."[3] In the context of use of the mails in execution of a scheme to defraud, it has been said that "The crime consists in the posting of the letters . . ., and if the defendant was not in the scheme when the letters were posted he was not a principal or an accessory to the crime then committed." Van Riper v. United States, 13 F.2d 961, 967 (2d

2. United States v. Joyce, 499 F.2d 9, pp. 16–17 (7th Cir., 1974).

3. See concession of Solicitor General, Levine v. United States, 383 U.S. 265, 266, 86 S.Ct. 925, 926, 15 L.Ed.2d 737 (1966).

Cir., 1926). Language tending to support the opposite conclusion in Bogy v. United States, 96 F.2d 734, 741 (6th Cir., 1938), cert. denied, 305 U.S. 608, 59 S.Ct. 68, 83 L.Ed. 387, does not appear to have been followed. Cf., from the same circuit, Blue v.. United States, 138 F.2d 351, 362 (6th Cir., 1943), cert. denied 322 U.S. 736, 64 S.Ct. 1046, 88 L.Ed. 1570 citing and applying *Van Riper.*

■■ In our opinion, conviction of Knippenberg on the first seven counts cannot be sustained on the theory that he ratified earlier activity by joining the conspiracy, nor is there evidence capable of supporting a finding, beyond a reasonable doubt, that he knowingly participated in the scheme before the times of mailing. There is no suggestion that additional proof would be available for a new trial.

### 2. *The transportation count.*

Count 8 charged that Walsh, Witchek and Knippenberg transported and caused to be transported in interstate commerce the four cashier's checks, from Pennsylvania to Illinois, knowing them to have been stolen, converted, and taken by fraud.

The proof showed that on August 18, Walsh represented to O'Hare that claims by four creditors of Valente were delaying the final processing of the Seay & Thomas loan. O'Hare then authorized Sechler to issue the checks to cover those claims, deeming them an advance under the bank's agreed loan to Valente. Walsh went to the bank, where he was joined by Knippenberg. Sechler gave Walsh the checks, for delivery to O'Hare. They induced Sechler to draw a check for $2,500 to Knippenberg for expenses. It was immediately cashed and the proceeds given to Knippenberg, although Knippenberg testified he kept only $250, giving the rest to Walsh. The three agreed that Walsh and Knippenberg would go immediately to Chicago, and Knippenberg would bring back the first installment of the Seay & Thomas loan. Walsh later represented to Sechler by telephone that the checks

had been delivered to O'Hare. Instead Walsh took them to Chicago.

In order to cash the checks (with forged endorsements) Walsh induced Mrs. Rost, a friend in the Chicago area, to deposit them in her bank account. Mrs. Rost testified that Walsh told her the checks were from Earl (Knippenberg), and there was testimony that she later asked Knippenberg if it had been all right to deposit the checks and he assured her it was. She testified that Knippenberg was present when she signed and turned over several blank checks apparently for the purpose of withdrawal of the proceeds.

■ There was ample testimony that Knippenberg joined in some of the false representations by which the $25,200 in checks was obtained (as well as the $2,500 for expenses). It is not claimed that he personally transported the checks to Chicago. It has been held in this type of situation that the evidence need only show that the interstate transportation was reasonably foreseeable by defendant. United States v. Scandifia, 390 F.2d 244, 249 (2d Cir., 1968), vacated on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297. This court has recently said in a relevant context that the government must show that a defendant was substantially involved in the chain of events leading to the unlawful transportation, or that he intended to aid in post-theft plans, or that he knew the details of the plans such as the specific destination of the goods. United States v. Greer, 467 F.2d 1064, 1069 (7th Cir., 1972). The evidence of Knippenberg's knowledge, intent, and participation in the enterprise was sufficient under these tests to make him criminally liable for the transportation.

### 3. *Absence of word "wilfully" in count 8.*

■ Count 8 need only have charged that defendants "did transport" the checks in interstate commerce even if its proof was limited to aiding and abetting. See Latham v. United States, 407 F.2d 1, 4 (8th Cir., 1969); United

States v. Washington, 287 F.2d 819, 820–821 (7th Cir., 1961), cert. denied, 366 U.S. 969, 81 S.Ct. 1933, 6 L.Ed.2d 1259; United States v. Adams, 454 F.2d 1357, 1358 (7th Cir., 1972), cert. denied, 405 U.S. 1072, 92 S.Ct. 1523, 31 L.Ed.2d 805. Count 8 went on to charge "and cause to be transported" without asserting, in the terms of 18 U.S.C. § 2(b), that they did *wilfully* cause the transportation.

■ The point is adequately disposed of by noting that the indictment was not challenged at or before trial. Where that is so, "the indictment will be upheld 'unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted.'" United States v. Santelises, 476 F.2d 787, 788 (2d Cir., 1973), quoting United States v. Trollinger, 415 F.2d 527, 528 (5th Cir., 1969).

4. *Instructions to the jury.*

■ In instructing the jury, the district court did not define "wilfully", although instructing that one who wilfully participates in the commission of a crime may be found guilty. The defendant did not request instructions dealing more specifically with the nature of the intent required with respect to the actual transportation of the checks and did not object to those given. We discern no plain error, and defendant is foreclosed as a result of his failure to object. Rule 30 F.R.Cr.P.

■ The same disposition is appropriate for defendants' belated challenge to the instruction that "Defendant has offered evidence of his good faith in making the representations alleged in the indictment." Defendant denied making the false representations attributed to him, and the instruction was somewhat inaccurate. Defendant was claiming, however, that his presence in Pennsylvania and activity in behalf of the Valente project were in good faith. In these circumstances, we do not consider the instruction plain error.

5. *Prosecutor's argument concerning Walsh's testimony.*

Both parties called Walsh as a witness. As a government witness he testified to his request of Mrs. Rost to deposit certain checks; and to an admission by Knippenberg that he reassured Mrs. Rost about the checks. He did not testify to any details of the scheme to defraud. When called by defendant, he denied making certain false representations and that Knippenberg had knowledge of or made false representations.

■ In argument to the jury government counsel commented on Walsh's testimony and the various reasons (including his criminal record) why Walsh was unworthy of belief. Counsel ultimately said "I am not asking you to believe anything that he said, I think, on the other hand, that you should disbelieve what he said." At the moment, the most potentially significant part of Walsh's testimony was that which was elicited when he was called by the defense, and parts of his testimony were virtually incredible on their face. We do not view the comment of government counsel as reversible error.

6. *Testimony in furtherance of conspiracy.*

■ Mrs. Rost was permitted to testify that Walsh told her the checks were from Earl. Defendant argues that this statement does not qualify as a statement made in furtherance of the conspiracy between the declarant, Walsh, and Knippenberg, against whom it was received. The record very reasonably bears the interpretation that Walsh told Mrs. Rost the checks were from Knippenberg so as to reassure her and help induce her to deposit them. So viewed the conspiracy exception to the hearsay rule was applicable.

The judgment of conviction and the sentence on the eighth count of the indictment are affirmed. The judgment of conviction and the sentence on each of the first seven counts are reversed and the cause remanded with directions to dismiss those counts.