**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James WORMICK, Jr.,
Defendant-Appellant.**

**No. 81–2617.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1982.

Decided June 2, 1983.

---

William M. Doty, Jr., Russo, Doty & Associates, Chicago, Ill., for defendant-appellant.

John H. Newman, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and ESCHBACH, Circuit Judges, and HOFFMAN, Senior District Judge.*

ESCHBACH, Circuit Judge.

The defendant appeals his conviction on five counts of violating 18 U.S.C. § 1341 through a mail fraud scheme designed to defraud State Farm Insurance by the submission of false automobile accident and theft claims. For the reasons below, we affirm in part and reverse in part.

I

The evidence adduced at Wormick's trial, taken in the light most favorable to the government, indicates that Wormick was involved in an insurance fraud scheme involving at least ten persons. Wormick's role, as a police officer in Dixmoor, Illinois, was to supply falsified police reports, for a price.

Ulric B. ("Buddy") Williams was at the center of this scheme. Beginning in 1976, he enlisted friends and acquaintances to defraud State Farm Insurance ("State Farm") out of approximately $143,000. Mr. Edward Gronowski, a State Farm claims supervisor, was paid to process the fraudulent claims quickly and for "top dollar." The defendant Wormick was paid to write false police accident and theft reports. Ulric Williams, using the aliases of Homer Boddy, John Travis and Elgin Carter, submitted and collected on eleven fraudulent claims. A friend of Williams, Rubylene Rayford, using her own name and the alias Francis Norris, submitted and collected on four fraudulent claims. Williams' employer, Elsa Townsell, in his own name and in the name of the body shop he owned, submitted and collected on six fraudulent

claims. Other members of the scheme included Williams' sister (Linda Williams, one claim), girlfriend (Jackie Miller, two claims), and a secretary at Townsell's body shop (Amarie Davis, one claim). Other of Williams' friends accounted for five other claims, bringing the total number of fraudulent claims to thirty.

Wormick's involvement with the scheme began in early summer of 1976, when Williams solicited his help in obtaining false police reports. Wormick agreed to write such reports for between $250 and $400 each. Wormick wrote nine separate police reports, supposedly documenting six accidents, thefts and recoveries.

A superseding indictment charged Wormick and several codefendants with nineteen counts of mail fraud, stemming from nineteen fictitious automobile accidents, thefts and recoveries, some of which involved multiple insurance claims. Wormick was named in counts three through nineteen, and the evidence adduced at trial indicates that he personally wrote police reports purportedly documenting the occurrences which were the bases for counts three, nine, twelve, fifteen, sixteen and nineteen. Wormick admitted writing the reports, but insisted that he was an unwilling dupe of the parties to the scheme, merely recording information they gave him, as required by police policy. He denied receiving any payment for any of the reports.

The jury acquitted Wormick of all counts covering occurrences for which he did not personally write a police report, as well as count three, chronologically the first occurrence for which he wrote a report. The counts on which Wormick was found guilty are described in more detail below.

The evidence relating to count nine indicates that Wormick wrote a theft recovery report on February 6, 1977 for a 1977 Pontiac Grand Prix which had never been stolen. The indictment alleges that Wormick knowingly caused to be placed in the mails mat-

* The Honorable Walter E. Hoffman, Senior District Judge of the United States District Court for the Eastern District of Virginia, sitting by designation.

ter including an application for auto insurance for the car.

Count twelve involved the supposed accident between a 1975 Buick LaSabre and a 1974 Mercury on April 20, 1977. The indictment charged that Wormick knowingly caused to be placed in the mails matter including a check from State Farm to Dunn-Rite Rent-A-Car.

Count fifteen also involved a supposed accident, this one between a 1971 Cadillac Brougham and a 1976 Oldsmobile on June 15, 1977. The indictment alleged that Wormick knowingly caused to be placed in the mails matter including an application for auto insurance on the Cadillac.

Count sixteen involved the supposed theft and recovery of a 1977 Pontiac on June 22, 1977. The indictment charged that Wormick knowingly caused to be placed in the mails matter including a letter from State Farm to the Dixmoor Police Department concerning the car.

Count nineteen involved a supposed three car accident on October 31, 1977, that resulted in over $20,000 in claims. This event involved a 1976 Buick Riviera, a 1977 Chevrolet, and a 1977 Cadillac. The indictment charged Wormick with knowingly causing to be placed in the mails a Dunn-Rite Rent-A-Car invoice addressed to State Farm Insurance.

Wormick was sentenced to two years imprisonment on count nine and five years probation on the remaining counts, consecutive to the term of imprisonment. Wormick appeals.

## II

Wormick raises three issues on appeal. First he challenges the admissibility of the government's evidence as well as the related argument regarding an incident, unrelated to the crimes charged, that resulted in Wormick's demotion from sergeant to patrolman for falsifying a police report. Second, he asserts that the government introduced no credible evidence linking him to the scheme to defraud. Finally, he contends that there is not a sufficient nexus

between his alleged conduct and the mailings charged in the indictment to support his convictions.

## III

### A. *Evidence of an Unrelated Falsified Police Report*

When testifying on his own behalf, Wormick asserted that at the time he wrote each of the police reports introduced into evidence, he believed the underlying theft or accident to be legitimate. On cross-examination, Wormick denied ever having knowingly falsified any information as a police officer.

The government offered, over objection, one rebuttal witness, Lieutenant Robert Vinson of the Dixmoor Police Department, who testified that Wormick had been demoted from sergeant to patrolman in September 1977 for neglect of duty and falsifying records. He related that Wormick had received a call that shots had been fired and later reported that the call was unfounded. Vinson interviewed the two people involved in the shooting incident, then he spoke with Wormick. Vinson stated that Wormick's account conflicted with what the two people had told him. Defense counsel's objection on hearsay grounds to an account of Vinson's conversation with the two people was sustained. Vinson testified that he made a recommendation to the Chief of Police on the basis of his investigation. He then read into the record a letter from the Chief of Police informing Wormick of his demotion and the reasons for the action. In response to the government's rebuttal, Wormick took the stand to explain the circumstances of his demotion.

In considering the government's rebuttal evidence, we face two issues—first, whether the *substance* of the evidence, i.e. demotion for falsifying police records, was admissible, and second, whether the *form* in which the evidence was introduced was admissible.

■ It is undisputed that the evidence of Wormick's demotion for falsifying a police report unrelated to the crimes with which he was charged could not be admitted to

show a general propensity to falsify reports. *See* Fed.R.Evid. 404(b); *United States v. Weidman,* 572 F.2d 1199, 1201 (7th Cir. 1978), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1979). However, in appropriate circumstances, the evidence could be introduced to show that Wormick falsified the reports that were part of the scheme intentionally rather than by accident or mistake. *See* Fed.R.Evid. 404(b); *Andresen v. Maryland,* 427 U.S. 463, 483, 96 S.Ct. 2737, 2749, 49 L.Ed.2d 627 (1976). Evidence of an unrelated "bad act" for the purpose of showing intent or absence of mistake is admissible if:

> (1) the prior act is similar enough and close enough in time to be relevant, (2) the evidence of the prior act is clear and convincing, (3) the probative value of the evidence outweighs the risk of prejudice, and (4) the issue to which the evidence is addressed is disputed by the defendant.

*United States v. Feinberg,* 535 F.2d 1004, 1009 (7th Cir.1976), *cert. denied,* 429 U.S. 929, 97 S.Ct. 337, 50 L.Ed.2d 300 (1977).

■ Addressing the first criterion, we believe that the act of falsifying the police report on the shooting incident is sufficiently similar to the acts of falsifying accident and theft reports to be relevant to the issue of intent and absence of mistake. Moreover, Wormick wrote the report on the shooting incident sometime between the theft/recovery report of count sixteen and the accident report of count nineteen. Wormick insisted that during this period, he was an innocent dupe of the parties to the insurance fraud scheme, unwittingly recording false information he believed to be true and accurate. The evidence that he had been demoted for falsifying a report during that time period is relevant to show that the other reports were also *intentionally* falsified. *Cf. United States v. Miller,* 573 F.2d 388, 392–93 (7th Cir.1978) (when defendant was charged with knowingly making a false statement for the purpose of influencing a federally insured bank, false statements made to other banks were admissible to show intent); *United States v. Kaufman,* 453 F.2d 306, 310–11 (2d Cir. 1971) (when defendant was charged with

making false affidavits to obtain default judgments in violation of federal law, evidence of false statements made on personal tax return was relevant to rebut his testimony that he was "an unwitting employee beguiled by his superiors into unknowingly signing false affidavits").

■ We must next decide whether the evidence of falsifying the unrelated police report was clear and convincing. While there are potential hearsay and opinion problems with the form in which the evidence was introduced, the evidence has sufficient indicia of reliability to satisfy this second criterion. A veteran police lieutenant investigated the shooting incident and concluded that Wormick had falsified the report. He recommended demotion to the Chief of Police, who in turn followed that recommendation. The fact that Wormick's report was the subject of a police investigation which resulted in demotion is clear and convincing evidence that the report was, in fact, falsified.

■ Determination of the third criterion, whether the probative value of the evidence outweighs the risk of prejudice, is left to the sound discretion of the trial court. *United States v. Lea,* 618 F.2d 426, 431 (7th Cir.), *cert. denied,* 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980). After a side bar discussion before presentation of the rebuttal evidence, the trial court balanced the competing interests and specifically concluded that, under the circumstances, the relevance outweighed possible prejudice. We find no abuse of discretion in this decision.

■ The fourth criterion is plainly met. The use to which the evidence of the unrelated falsified report was addressed—whether Wormick intentionally falsified theft and accident reports—was vigorously disputed by Wormick.

Having found that all four criteria were satisfied, we conclude that evidence of the unrelated falsified report was admissible for the purpose of showing intent and lack of mistake. We now turn to the question

of whether this rebuttal evidence was offered in an inadmissible form.

The government's rebuttal witness, the police lieutenant who investigated the report Wormick had written on the shooting incident, had personal knowledge of the demotion. The relevance of his testimony, however, stemmed not from the demotion itself, but from the falsified report that precipitated the demotion. Neither Lieutenant Vinson, who concluded that Wormick's report was false, nor the Chief of Police, who wrote the demotion letter, had personal knowledge of the shooting incident. Vinson's testimony and the demotion letter, therefore, raise potential opinion and hearsay problems.

■ An examination of the record discloses that Wormick made a general objection to the proposed rebuttal evidence after the side bar conference. The basis of the objection was not explicitly stated, but from the context we can infer that it was on the ground that the proffered evidence was not sufficiently relevant, and that any relevance was outweighed by the risk of prejudice. During the presentation of the rebuttal evidence, Wormick made only one objection to the form of the evidence, a hearsay objection to Vinson's recounting what the two people involved in the shooting incident had told him, which was sustained. He made no other objection based on hearsay or opinion to the rest of the rebuttal evidence. Unless admission of that evidence was plain error, Wormick cannot now question its admissibility on grounds not presented to the trial court. See United States v. Cook, 432 F.2d 1093, 1103 (7th Cir.1970), cert. denied, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971). Finding that any error in admitting this evidence would not be plain error, we conclude that Wormick cannot now challenge the rebuttal evidence on hearsay or opinion grounds.

Wormick finally contends that it was reversible error for the prosecutor to pose a rhetorical question in final argument which implied that the evidence of the unrelated falsified report showed that Wormick was the sort of person that would falsify other reports. Wormick made no objection to this comment, nor did he request a curative or limiting instruction.

■ When an alleged error in closing argument is raised for the first time on appeal, it is subject to the plain error standard of review. United States v. Skelley, 501 F.2d 447 (7th Cir.), cert. denied, 419 U.S. 1051, 95 S.Ct. 629, 42 L.Ed.2d 647 (1974). This doctrine is to be applied cautiously and only in exceptional cases when the defendant has been unfairly prejudiced. United States v. Castenada, 555 F.2d 605, 610 (7th Cir.), cert. denied, 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977). Infrequent and unintentional misstatements of the evidence do not constitute plain error. United States v. Zarattini, 552 F.2d 753, 761 (7th Cir.), cert. denied, 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977). We believe that Wormick was not unfairly prejudiced by one isolated and apparently overexpansive comment regarding the evidence admitted for a limited purpose. "[T]he unwise comment here does not rise to the dignity of plain error, to require reversal when not brought to the attention of the trial court." United States v. Skelley, supra, 501 F.2d at 456.

### B. Sufficiency of the Evidence

Wormick argues that the government submitted no credible evidence to link him to the scheme to defraud. His primary contention is that all of the witnesses against him were members of the scheme and the principal witness, Williams, is a convicted felon.

■ It is axiomatic that in assessing the sufficiency of the evidence on a criminal appeal, a reviewing court will view the evidence in the light most favorable to the government, see Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Rumell, 642 F.2d 213, 216 (7th Cir.1981), and will not retry the case or reassess the credibility of witnesses, see United States v. Grabiec, 563 F.2d 313, 316 (7th Cir.1977). In the instant case, the testimony of the government's

witnesses was more than sufficient to link Wormick to the scheme to defraud. Moreover, this testimony was bolstered by irregularities in the police reports Wormick wrote as part of the scheme, discrepancies between Wormick's trial testimony and his grand jury testimony, and the inherent implausibility of the particulars of Wormick's defense.

■ Wormick also argues that the jury was not properly instructed on the possible prejudice the co-schemers might have against Wormick or the motives they might have to testify against him. However, the court advised the jury that Williams, Townsell and Rayford had pled guilty to crimes arising from the occurrences for which Wormick was being tried and that Gronowski had admitted complicity in the alleged crimes. The court then counseled that the testimony of these witnesses must be considered with great caution and care. Moreover, neither at the conference on instructions nor at any time thereafter at trial did Wormick's counsel object to this instruction. We therefore find Wormick's attack on the instruction both untimely and without merit.

### C. The Mailings and Wormick's Conduct

Wormick attempts to escape responsibility for the various mailings charged in the indictment by asserting that he neither personally mailed any of the materials nor knew of the particular mailings. He asserts that the insurance applications which formed the bases for counts nine and fifteen were mailed before he wrote the police reports concerning those cars. He asserts that there is only negligible evidence to connect him with the mailings that formed the bases of counts twelve, sixteen and nineteen.

■ Wormick's approach to mail fraud is far too narrow. Rather than evaluating each of his actions in isolation, we must closely examine them in the context of the scheme as a whole. *See United States v. Lea,* 618 F.2d 426, 431 (7th Cir.), *cert. denied,* 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980). Moreover, conspiracy doctrines apply to a multi-member mail fraud scheme even if the indictment does not formally charge conspiracy. *United States v. Wilson,* 506 F.2d 1252, 1257 (7th Cir.1974); *United States v. Knippenberg,* 502 F.2d 1056, 1059 (7th Cir.1974). Although Wormick cannot be held accountable for mailings that occurred before he joined the scheme, *id.,* once he becomes a party to the scheme, he can be held accountable for mailings caused by other members, whether or not he knew of or agreed to any specific mailing. *See United States v. Wilson, supra,* 506 F.2d at 1257; *United States v. Joyce,* 499 F.2d 9, 16 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974).

■ There was sufficient evidence to link Wormick to this scheme as early as summer of 1976, well before any of the mailings in question. Wormick's co-schemers personally mailed the insurance applications that formed the bases of counts nine and fifteen. And although no party to the scheme personally mailed the materials that formed the bases of counts twelve, sixteen and nineteen, the parties to the scheme can be found to have caused the mailing if they committed acts with the knowledge that use of the mails would follow in the ordinary course of business, or when use of the mails could reasonably be foreseen. *See Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954); *United States v. Stanford,* 589 F.2d 285, 295 (7th Cir.1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979). Clearly, the use of the mails to send invoices and reimbursement checks in connection with car rentals is foreseeable when one rents a car. Thus Wormick and his co-schemers caused the mailings that formed the bases of counts twelve and nineteen. The mailing that formed the basis of count sixteen, a letter from State Farm to the Dixmoor Police Department, presents a closer question, but we conclude that the co-schemers, by submitting a theft claim to State Farm, could have reasonably foreseen that State Farm would correspond with the police department. Therefore, we hold that Wor-

mick, through his co-schemers, caused this mailing.

In order to support a mail fraud conviction, the mailing must not only have been caused by the schemers, but also must have been for the purpose of executing the scheme. *See* 18 U.S.C. § 1341. We must therefore determine if the mailings that formed the bases of the counts on which Wormick was convicted were in furtherance of the scheme.

This court succinctly summarized the state of the law in this area as follows:

> Mailings are in furtherance of a scheme if they are incidental to an essential part of the scheme. *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358 [362–363], 98 L.Ed. 435 (1954). Under this definition, mailings made after the scheme has reached its fruition are not in furtherance of the scheme. *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), nor are mailings which conflict with the purposes of the scheme and have little effect upon the scheme. *United States v. Staszcuk,* 502 F.2d 875 (7th Cir. 1974). On the other hand, mailings made to promote the scheme, *United States v. Joyce,* 499 F.2d 9 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974), or which relate to the acceptance of the proceeds of the scheme, *United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974), or which facilitate concealment of the scheme, *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), have been found to have been in furtherance of the scheme under this definition.

*United States v. Rauhoff,* 525 F.2d 1170, 1176 (7th Cir.1975).

Clearly, the mailings of the applications for auto insurance that formed the bases of counts nine and fifteen were incident to an essential part of the scheme. Obtaining such insurance coverage was at the heart of the scheme.

The invoice sent from Dunn-Rite Rent-A-Car to State Farm was in further-

ance of the scheme in that it facilitated concealment of the scheme. State Farm may have become suspicious if no one involved in a massive three car accident had rented a car while the cars involved were being repaired or replaced. The invoice, signed by Ulric Williams using the alias "Elgin Carter," furthered the scheme by adding realism to the incident. We conclude that this mailing, which formed the basis of count nineteen, sufficiently supports conviction.

The check sent from State Farm to Dunn-Rite, which formed the basis of count twelve, presents a closer question. The Supreme Court teaches us that mailings that are directed to the end of adjusting accounts between the victims of a scheme after the scheme has reached fruition cannot support a mail fraud conviction. *United States v. Maze,* 414 U.S. 395, 402, 94 S.Ct. 645, 649, 38 L.Ed.2d 603 (1974); *see Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 150, 89 L.Ed. 88 (1944). In *Maze,* the defendant had charged motel services on a stolen credit card, and the mailings that formed the bases of the charges were invoices from the motels to the bank that had issued the card. The Court found that the defendant's scheme had reached fruition when he checked out of each motel, and that the success of his scheme did not depend on which of his victims ultimately bore the loss. *United States v. Maze, supra,* 414 U.S. at 402, 94 S.Ct. at 649. In contrast, the instant scheme, viewed as a whole, did not reach fruition when one of the participants obtained use of the rental car at no cost. The very purpose of renting the car, in fact, was to give a fictitious accident an air of authenticity, and this in turn depended on the smooth functioning of the reimbursement system by which State Farm paid Dunn-Rite. The success of that particular element of the scheme, and of the entire ongoing scheme, depended on Dunn-Rite being duly paid for its services. We therefore conclude that this mailing formed a sufficient basis for count twelve.

Finally, we consider the mailing that formed the basis for count sixteen, a

letter from State Farm to the Dixmoor Police Department. The evidence adduced at trial regarding this letter is sketchy. It was stipulated that the copy of the letter entered into evidence was a business record and that the original was mailed from State Farm to the Dixmoor Police Department on or about June 27, 1977. Beyond that, the record is silent. The copy of the letter itself sheds no light, being the carbon copy of information apparently typed into the blanks of a pre-printed form. Aside from the heading and signature block, the carbon consists of the following:

13S804–274
Frances [sic] Norris
Parked and Unocc.
6–22–77
1:30 A.M.
Ro-Al Hut Lounge 144th and Paulina
TOTAL THEFT

From the evidence presented, the jury could only speculate whether this letter was in furtherance of the scheme. Even if we accept the government's representation on appeal that this letter was a request for confirmation of the theft, we would have to conclude that this mailing was not in furtherance of the scheme. Such an inquiry, in fact, would probably increase the chances of detection, and thus could not be said to be *in furtherance* of the scheme, *see United States v. Maze, supra,* 414 U.S. at 403, 94 S.Ct. at 650. We therefore hold that Wormick's conviction on count sixteen must be reversed.

### IV

For the reasons above, we affirm Wormick's convictions on counts nine, twelve, fifteen and nineteen, and we reverse his conviction on count sixteen. We remand for re-sentencing since the reversal of the conviction on count sixteen may lead the trial judge to modify the sentences on other counts. However, we do not mean to imply that the trial court must or should alter the sentences on the counts other than count sixteen. We simply provide the trial judge with the opportunity to exercise his judgment in that regard. Of course, Circuit Rule 18 does not apply.