**SOUND VIDEO UNLIMITED, INC.,**
**and Electratainment, Inc.,**
**Plaintiffs,**

**v.**

**VIDEO SHACK INC., Arthur H. Morow-itz, Howard J. Farber, Arthur C. Zwemke and Howard P. Levine, Defendants,**

**v.**

**Noel GIMBEL and Lee Gimbel,**
**Additional Defendants on**
**Counterclaim.**

**No. 86 C 8780.**

United States District Court,
N.D. Illinois, E.D.

May 29, 1987.

Bernard J. Nussbaum, Alan M. Posner, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for plaintiffs and counterdefendants.

James A. Janowitz, David A. Nicholas, Pryor, Cashman, Sherman & Flynn, New York City, Victor E. Grimm, Dennis P.W. Johnson, Bell, Boyd & Lloyd, Chicago, Ill., for defendants.

### MEMORANDUM AND ORDER

MORAN, District Judge.

The defendants-counterclaimants in this action move for an order under Rule 37 of the Federal Rules of Civil Procedure to compel certain non-party witnesses to answer deposition questions. The deponents asserted the attorney-client privilege in refusing to answer the questions. Because this court is persuaded that at least some of the questions pertain to matters within the crime/fraud exception to the attorney-client privilege, the motion is granted in part.

### I. BACKGROUND

Sound Video Unlimited, Inc. ("Sound Video") and Electratainment, Inc. ("Electratainment") are the plaintiffs in a civil action now pending in the United States District Court for the Southern District of New York (*Sound Video Unlimited, Inc. v. Video Shack, Inc.*, No. 83 Civ. 58583

(S.D.N.Y. filed August 11, 1982)) (the "New York action"). Noel Gimbel is the president of both corporations. He owns 90% of the capital stock of Electratainment, which in turn owns 100% of the capital stock of Sound Video. Sound Video and Electratainment are Delaware corporations and each has its principal place of business in Niles, Illinois. This motion concerns depositions taken pursuant to subpoenas issued by this court.

Sound Video is a wholesaler of electronic entertainment media such as video cassette tapes, video discs, blank video cassette tapes and accessories. Video Shack Inc. ("Video Shack"), the corporate defendant in the New York action, is a retailer of the same items. Video Shack is a closely-held New York corporation with its principal place of business in New York, New York. Arthur H. Morowitz owns 60% of Video Shack's capital stock; Howard J. Farber owns the remaining 40%. Morowitz and Farber are officers of Video Shack and they are also defendants in the New York action. The other individual defendants are Arthur Zwemke, formerly a vice-president of Sound Video, and Howard Levine, a former Sound Video employee under Zwemke's supervision. All the defendants in the New York action join in this motion.

According to the complaint, Video Shack and Sound Video began negotiating an agreement to combine their operations into a national retail and wholesale distribution network. They reached an agreement in October 1981 and combined their operation shortly thereafter. Management and control of Electratainment, Sound Video and Video Shack were restructured by agreement executed in March 1982. However the combination of Sound Video and Video Shack proved to be abortive. In substance, Sound Video and Electratainment allege that the transaction was part of a scheme to defraud them. The alleged scheme was to obtain money from Sound Video without giving anything in return by manipulating Sound Video's inventory data and account payments through collusion with Zwemke and Levine, and ultimately to take control of Sound Video's operations. Among other things, Sound Video and Electratainment seek to recover for common law fraud,

conversion, waste and mismanagement, breach of contract and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

The issues on this motion concern deposition questions pertaining to counterclaims by Zwemke and Morowitz against Gimbel ("the wiretapping counterclaims"). Zwemke and Morowitz each allege in separate counts that Gimbel violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 ("Title III") by (1) tapping Zwemke's office telephone and intercepting their conversations; (2) disclosing the contents of their conversations to various third parties; and (3) using the contents of their conversations to prepare for and prosecute the New York action.

The affidavits and deposition excerpts show that many of the facts underlining the wiretapping counterclaims are undisputed. By April 1982 Gimbel was dissatisfied with the arrangement between Sound Video and Video Shack for a variety of reasons (Janowitz reply aff., exh. A, Gimbel dep. at 550–51). He suspected by the middle of June 1982 that Zwemke and Morowitz were conspiring to take control of Sound Video (Janowitz reply aff., exh. A, Gimbel dep. at 54; plaintiffs' surreply mem., exh. B, Gimbel dep. at 1547). He shared his concerns with John Hug, an auditor with the accounting firm of Peat, Marwick & Mitchell, at a meeting on June 23, 1982 (*e.g.,* Janowitz reply aff., exh. A, Gimbel dep. at 538–49; plaintiffs' surreply mem., exh. C, Hug dep. at 397–98). Because of his concerns, Gimbel asked Mr. Hug to take a complete inventory at Sound Video's upcoming audit, rather than using the usual procedure, which entails only a partial inventory (Janowitz reply aff., exh. A, Gimbel dep. at 543–44; plaintiffs' surreply mem., exh. B, Gimbel dep. at 1198). Mr. Hug expressed some skepticism at least initially (Janowitz reply aff., exh. A, Gimbel dep. at 542–43, 546; plaintiffs' surreply mem., exh. B, Gimbel dep. at 1198).

Gimbel was "a little bit disturbed ... that [Mr. Hug] thought [Gimbel] may have been imagining things or that [he] wasn't to be taken seriously" (plaintiffs' surreply mem., exh. B, Gimbel dep. at 1199). Gimbel was already satisfied that Zwemke and Morowitz were conspiring to take over Sound Video. Nevertheless, he taped Zwemke's telephone to verify his suspicions (Janowitz aff., exh. D, Gimbel dep. at 1178; plaintiffs' surreply mem., exh. B, Gimbel dep. at 1547), to assure his attorneys he was not imagining things and to give them "something to go on" (Janowitz aff., exh. D, Gimbel dep. at 1189, 1197–98). During the last week of June 1982 he personally connected a wiretapping device to Mr. Zwemke's office telephone (Janowitz aff., exh. D, Gimbel dep. at 1216). He connected wires to the junction box of Zwemke's telephone, hid the wires by running them along the carpeting in Zwemke's office into the adjoining office, and connected the wires to a self-activated recording device hidden in his office closet (*id.* at 1214–21). As long as Gimbel put a tape in the recording device, all of Zwemke's telephone calls were recorded (*id.* at 1294–95). He disconnected the device on or about July 5, 1982 (*id.* at 1202).[1] Gimbel's administrative assistant, Barbara Hoffman, transcribed the tapes at her home over the July 4 weekend in 1982 (Janowitz aff., exh. I, Hoffman dep. at 104–11).

On the first business day after the July 4 weekend in 1982, Ms. Hoffman returned the tapes to Gimbel, along with an original and two copies of the transcript she had just prepared (Janowitz aff., exh. I, Hoffman dep. at 109). Around that time Gimbel met with his attorneys, including his personal attorney, Martin Cohn, James Chatz from Chatz, Berman, Maragos, Haber & Fagel, and attorneys from Lord, Bissell & Brook (Janowitz aff., exh. D, Gimbel dep. at 1193). Gimbel gave them a box containing "everything that [he] had at the time," including "all the tapes and information" (Janowitz aff., exh. D, Gimbel dep. at 1193; plaintiffs' surreply mem., exh. B, Gimbel

dep. at 1192). Sound Video commenced the New York action a few weeks later, on August 11, 1982 (Janowitz aff. ¶ 3).

Many of the tapes and transcripts of conversations between Zwemke and Morowitz that Gimbel gave his attorneys were derived from sources other than the allegedly illegal wiretaps. Sound Video maintains that Gimbel gave his attorneys these materials ("the other transcripts") but not the tapes and transcripts derived from the allegedly illegal wiretaps ("the wiretap transcripts"). Although the other transcripts were produced in response to Video Shack's discovery request in this action in early 1984, the wiretap transcripts were not produced until August 1, 1986 after Ms. Hoffman turned them over to Sound Video's present litigation counsel. Zwemke and Morowitz filed their counterclaim in October 1986.

Who knew of the wiretap transcripts besides Gimbel and Ms. Hoffman and why they were not produced earlier are disputed issues on this motion. Video Shack's litigation attorneys, who were first retained by Video Shack in 1983, claim that they did not learn of the wiretap transcripts until late spring 1986. Sound Video dismisses that claim as "half-baked" and they cite purportedly evasive and contradictory deposition testimony in support of their claim that Sound Video was trying to cover up the allegedly illegal wiretaps. In any event, on January 16, 1987 the district judge presiding over the New York action imposed discovery sanctions against Sound Video in the amount of $42,381.00 for their untimely production of the wiretap transcripts. The judge also entered an order precluding the use of the wiretap transcripts as evidence in this case (Janowitz aff. ¶ 10).[2]

## II. REFUSAL TO ANSWER DEPOSITION QUESTIONS

Video Shack deposed Mr. Cohn, Mr. Chatz and Ms. Hoffman in connection with the wiretapping counterclaim. At their

---

1. The conversations covered by the transcripts at issue here occurred between June 28 and July 2, 1982.

2. Unfortunately, the parties have not supplied this court with a copy of Judge Goettel's order or of the magistrate's report he adopted.

depositions Mr. Cohn and Mr. Chatz invoked the attorney-client privilege in refusing to answer questions about their communications with Gimbel about his wiretapping activities. Ms. Hoffman invoked the attorney-client privilege in refusing to answer questions about her communications with Robert Milner, one of Sound Video's attorneys in this matter. Video Shack argues that the attorney-client privilege does not apply because the communications at issue fall within the crime/fraud exception to that privilege.

■ The attorney-client privilege does not apply when the person consults an attorney to further a continuing or future crime, fraud or other misconduct. *See, e.g., In re Sealed Case*, 754 F.2d 395, 399 (D.C.Cir.1985); *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 59 (7th Cir.1980); *United States v. Aldridge*, 484 F.2d 655, 658 (7th Cir.1973), *cert. denied*, 415 U.S. 921, 94 S.Ct. 1423, 39 L.Ed.2d 477 (1974). *See generally Developments in the Law—Privileged Communications*, 98 Harv.L.Rev. 1450, 1501–14 (1985). Attorney-client communications also fall within the crime/fraud exception if they were made to conceal a past crime or fraud. *See, e.g., In re John Doe Corp.*, 675 F.2d 482, 491 (2d Cir.1982); *In re Special September 1978 Grand Jury (II)*, 640 F.2d at 60–61; *see also, e.g., United States v. Wormick*, 709 F.2d 454, 462 (7th Cir.1983) (mailings that conceal a scheme to defraud are in furtherance of the scheme for the purposes of the mail fraud statute). However, the attorney-client privilege remains intact when a person consults an attorney in an effort to defend against past misconduct or to get legal advice or assistance. *See, e.g., In re Special September 1978 Grand Jury (II)*, 640 F.2d at 59; *Union Carbide Corp. v. Dow Chemical Corp.*, 619 F.Supp. 1036, 1052 (D.Del.1985).

■ A communication is not subject to disclosure merely because it relates to a crime or fraud or because it would help to prove that one existed. *See, e.g., In re Antitrust Grand Jury*, 805 F.2d 155, 168 (6th Cir.1986); *Pritchard-Keang Nam Corp. v. Jaworski*, 751 F.2d 277, 282–83 (8th Cir.1984). Rather, the moving party must first make a *prima facie* showing of

a violation sufficiently serious to defeat the privilege. *See, e.g., In re Sealed Case*, 754 F.2d at 399; *In re Special September 1978 Grand Jury (II)*, 640 F.2d at 60, *quoting Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933). The moving party satisfies that burden if it offers evidence which, if believed by the trier of fact, would establish the elements of an ongoing or imminent offense. *E.g., In re Sealed Case*, 754 F.2d at 399; *In re Grand Jury Subpoenas Dated December 18, 1981 and January 4, 1982*, 561 F.Supp. 1247, 1254–55 (E.D.N.Y.1982); *see also Union Carbide*, 619 F.Supp. at 1052 (each element of fraud must be established by *prima facie* evidence). Second, the moving party must establish some relationship between the communications at issue and the alleged offense. *See, e.g., In re Sealed Case*, 754 F.2d at 399. The moving party need not make a specific showing of the client's intent in consulting the attorney, but the evidence must support the inference that the attorney's representation or advice assisted the client in committing the alleged offense. *Id.* at 402 (mere coincidence in time, without more, is not enough).

## A. The Alleged Offenses

Video Shack contends that Gimbel's communications with Mr. Cohn and Mr. Chatz in July 1982, and Ms. Hoffman's communications with Mr. Milner in the spring of 1986, were intended to further the Title III violations alleged in the wiretapping counterclaims. When Gimbel tapped Zwemke's telephone, Title III provided for civil and criminal penalties against any person who, with certain exceptions,

(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication;

(b) willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—

(i) such device is affixed to, or otherwise transmits a signal through, a

wire, cable, or other like connection used in wire communication;

\* \* \* \* \* \*

(c) willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of the subsection; or

(d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection[.]

18 U.S.C. §§ 2511(1), 2520; *see also* 18 U.S.C. § 2515 (prohibiting use of communications intercepted in violation of 18 U.S.C. §§ 2510–2520, as evidence in court, or elsewhere).[3] The first question this court must consider is whether Video Shack has made a *prima facie* showing of the wiretapping offenses it alleges.

Video Shack maintains that Gimbel violated § 2511 by

(1) installing the wiretapping device (the "§ 2511(1)(b)(i) violation");

(2) intercepting and recording Zwemke's conversations without Zwemke's consent or the consent of the other parties to the recorded conversations (the "§ 2511(1)(a) violation");

(3) disclosing the contents of the intercepted conversations to his attorneys (the "§ 2511(1)(c) violation"); and

(4) using the contents of the intercepted conversations to prepare for and prosecute this action (the "§ 2511(1)(d) violation").

Apparently conceding, as it seems it must, that Video Shack has made a *prima facie* showing on all the other elements of the alleged wiretapping offenses, Sound Video contends that there is no evidence that

Gimbel acted willfully in wiretapping Zwemke's telephone.

In *Citron v. Citron,* the Second Circuit affirmed the district court's holding that

liability under Title III—be it civil or criminal—cannot be established against any defendant without a showing that he acted with intentional or reckless disregard of his legal obligations.

539 F.Supp. 621, 626 (S.D.N.Y.1982), *aff'd* 722 F.2d 14, 16–17 (2d Cir.1983), *cert. denied,* 466 U.S. 973, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984).[4] Sound Video contends that there has been no *prima facie* showing that Gimbel knew that wiretapping Zwemke's telephone, recording his conversations and disclosing the contents of those conversations was illegal. Therefore, Sound Video maintains, there has been no *prima facie* showing of willfullness and no *prima facie* showing that Gimbel committed the alleged wiretapping offenses, let alone that he consulted Mr. Cohn and Mr. Chatz to further those offenses. Sound Video relies on deposition testimony in which Gimbel denied any knowledge that his conduct was illegal (plaintiffs' reply mem., exh. A, Gimbel dep. at 1207).

▆ Despite this general denial, there is enough in the record for a reasonable trier of fact to conclude that Gimbel either knew or recklessly disregarded that his wiretapping activities were illegal. For example, wiretapping equipment is not readily available. Under 18 U.S.C. § 2512 it is illegal to manufacture, distribute, possess or advertise wiretapping devices. Gimbel bought the device he used to tap Zwemke's telephone for cash, from a police officer whose name he doesn't know and whom he could not now identify (Janowitz reply aff., exh. A, Gimbel dep. at 1227–34). Moreover, Gimbel had some expertise in telecommunications. He worked in that area in the Armed Services and he installed the device

---

**3.** The statute was amended by the Electronic Communications Privacy Act of 1986. P.L. 99–508. The Act was passed on October 21, 1986, and the amendments became effective 90 days later. They do not directly apply here.

**4.** This holding has been superseded by the Electronic Communications Privacy Act of 1986, *see*

note 3, *supra,* which substituted "intentionally" for "willfully." The legislative history of the Act also casts some doubt on the *Citron* holding. *See* Sen.Rep.No. 99–541, *reprinted in* 1986 U.S. Code Cong. & Ad. News 3555, 3577–78, *quoting* Sen.Rep. No. 97–307 at 67. However, because both sides have relied on the *Citron* holding, we treat it as controlling here.

**1488**

himself (Janowitz reply aff. ¶¶ 17, 36; Janowitz aff. exh. D, Gimbel dep. at 1216–21). Finally, he installed the device after normal business hours, took care to conceal it, and after Ms. Hoffman transcribed the tapes he instructed her to discard the original transcripts (Janowitz aff., exh. D, Gimbel dep. at 1216–21; Janowitz aff., exh. I, Hoffman dep. at 49–50, 57). Video Shack need not now show willfullness by a preponderance of the evidence; it only needs to make a *prima facie* showing, and this it has done. *See, e.g., In re A.H. Robins Co., Inc.,* 107 F.R.D. 2, 9, 15–16 (D.Kan.1985); *cf. Abel v. Bonfanti,* 625 F.Supp. 263, 271 (S.D.N.Y. 1985) (rejecting defendants' motion for summary judgment on wiretapping claims based on the willfullness issue).[5]

### B. Connecting the Communications with the Alleged Offenses

■ Although this court finds that Video Shack has made a *prima facie* showing that Gimbel has violated the wiretapping statute, not all of the communications on which Video Shack seeks discovery were intended to further the alleged violations. Nothing in the record shows that Gimbel communicated with his attorneys to assist him in wiretapping Mr. Zwemke's telephone, or in recording his conversations (the § 2511(1)(b)(i) violation and § 2511(1)(a) violation, respectively).[6] Similarly, even assuming that Gimbel's mere disclosure of the contents of the intercepted conversations to his attorneys violated § 2511(c), this court does not believe that

Gimbel's communications with his lawyers assisted him in committing that violation. *Cf. McQuade v. Michael Gassner Mech. & Elec. Contractors, Inc.,* 587 F.Supp. 1183 (D.Conn.1984) (allowing allegedly illegal wiretap recordings to be disclosed to counsel in civil action under 18 U.S.C. § 2520). Gimbel's communications with his attorneys on those topics therefore remain privileged.

■ Nevertheless, Video Shack has sufficiently shown that Gimbel consulted his attorneys to assist him in using the allegedly illegal wiretap transcripts to prepare and prosecute this lawsuit (the § 2511(1)(d) violation). Gimbel testified that he intercepted Zwemke's conversations in anticipation of a lawsuit and to give his attorney something to go on. Although his testimony is not crystal-clear, Gimbel stated that he gave his attorneys all the materials he had, presumably including the cassette recorder he used to tape the intercepted conversations and the wiretap transcripts, in July 1982. After several meetings and discussions, Gimbel's attorneys filed a complaint containing allegations covering some of the same matters discussed by Zwemke and Morowitz in the intercepted conversations.[7]

Sound Video's present counsel claim to have been unaware of the wiretap transcripts until spring 1986. But simply because they did not use the wiretap transcripts in connection with this matter does not necessarily mean that Gimbel or his

---

**5.** Sound Video devotes considerable attention to *Jandak v. Village of Brookfield,* 520 F.Supp. 815 (N.D.Ill.1981). That case involved a communications system installed by the Illinois Bell Telephone Company for the Brookfield Police Department. The court there held that the routine, nonsurreptitious use of that equipment by the police chief to monitor an investigative telephone line was not actionable under 18 U.S.C. §§ 2511, 2520 where it resulted in recording the conversation of a police officer misusing the line for private purposes. It determined that the recording came within 18 U.S.C. § 2510(5)(a)(ii), a statutory exception for equipment used by an investigative or law enforcement official in the ordinary course of his duties. The court in *Jandak* carefully emphasized the limits of its holding, and this case certainly does not come within those limits. *See* 520 F.Supp. at 825.

Sound Video also cites *Jandak* to support its argument that Gimbel could not have acted "willfully" because the law under Title III is unsettled in many respects. However, the court in *Jandak* rejected a similar contention, noting that Title III does not provide an exception for a misinterpretation of its terms, even if the misinterpretation was in good faith. 520 F.Supp. at 819–20, *citing Campiti v. Walonis,* 611 F.2d 387, 395 (1st Cir.1979).

**6.** The record shows that Gimbel consulted with Mr. Cohn, Mr. Chatz and attorneys from Lord, Bissell & Brook only after the wiretapping activity occurred.

**7.** The wiretapping transcripts are more directly implicated in Sound Video's first amended complaint, which was filed by Sound Video's current litigation counsel in the spring of 1983.

former attorneys did not use the information gleaned from them. Moreover, Video Shack does not now seek to compel testimony from Sound Video's present litigation counsel.

The mysterious disappearance of the wiretap transcripts between 1982 and the spring of 1986 also supports the inference that Gimbel communicated with his attorneys about concealing the wiretap transcripts. Gimbel's testimony indicates that he turned the wiretap transcripts over to his attorneys in June 1982. When Sound Video changed counsel in the spring of 1983, Gimbel's attorneys gave Sound Video's present litigation counsel all of their materials connected with this case. However, the wiretap transcripts apparently were not among those materials, nor apparently was the tape recorder allegedly used to record the intercepted conversations. Affidavits by Sound Video's present litigation counsel state that they did not learn of the wiretap transcripts until the spring of 1986. The mishandled discovery in this case further supports the inference of a cover-up. *See also In re Sealed Case,* 754 F.2d at 401 & n. 5.

■ Accordingly, Gimbel's communications with Mr. Cohn and Mr. Chatz about using information from the intercepted conversations to prepare and prosecute this lawsuit fall within the crime/fraud exception to the attorney-client privilege. Similarly, communications about concealing the wiretapping and the wiretap transcripts also fall within the exception. Mr. Cohn and Mr. Chatz must answer questions pertaining to those subjects. This court does not suggest that the deponents, all respected attorneys, must answer such questions because it has been demonstrated that they facilitated an offense. The actual facts may be quite to the contrary. Rather, because there is some evidence to support such a charge, particularly the testimony of their client, the privilege cannot stand as a barrier for further inquiry to determine what the facts actually are. However, communications concerning Gimbel's actual installation of the wiretapping device, his recordings of the conversations and his disclosure of the intercepted conversations to his attorneys, as opposed to any subsequent use of the intercepted conversations or cover-up of the alleged violations, remains privileged. Mr. Cohn and Mr. Chatz may still legitimately claim the privilege for those communications.

The court realizes that this ruling may require hairsplitting distinctions in future depositions, but that result seems inevitable. *See In re Sealed Case,* 754 F.2d at 401 ("in attempting to balance the important policies underlying the attorney-client privilege with those that would remove the privilege when it is abused, courts sometimes are required to draw fine lines in close cases"). In particular, to the extent questions about Gimbel's communications to his attorneys about the wiretapping, recording, transcription and disclosure are necessary to lay a foundation for questions about any subsequent use of the intercepted conversations or cover-up of the alleged violations, those questions should be answered or counsel should agree on appropriate stipulations. The parties of course are free to move for further clarification of this order if it is necessary to resolve any good faith disputes that arise.

## C. Ms. Hoffman's Claim of Privilege

■ Video Shack also argues that communications between Ms. Hoffman and Sound Video's current litigation counsel fall within the crime/fraud exception. The court disagrees. Assuming for present purposes that Sound Video's current litigation counsel illegally used information from the wiretap transcripts in this action, the record does not show how any communications with Ms. Hoffman furthered that violation. She consistently stated that she typed the transcripts in 1982, has not looked at them since, and does not recall their contents (plaintiffs' response mem., exh. D, Hoffman dep. at 21, 33–34, 41–43, 53, 57–64, 81, 97–100). Her testimony shows only that she discussed the existence of the wiretap transcripts, not their contents. Gimbel's testimony corroborates Ms. Hoffman's account (plaintiffs' reply mem., exh. A, Gimbel dep. at 21, 34). Her conduct would not in itself violate § 2511(1)(c) or (d) because those provisions only apply to disclosure and use of the

*contents* of illegally intercepted communications. Video Shack also contends that Ms. Hoffman concealed the wiretap transcripts, but even assuming she did, the record does not show that she consulted Sound Video's current litigation counsel in furtherance of the alleged concealment. The communications on which Video Shack seeks discovery occurred in the context of producing the wiretap transcripts. Thus Ms. Hoffman's communications with Sound Video's current litigation counsel remain privileged because they did not further any of the alleged wiretapping offenses, either directly or by concealing them.

### D. Motion to Enjoin Invocation of the Attorney-Client Privilege in Future Discovery Proceedings

Video Shack plans to conduct further discovery in this action. It seeks an order "enjoining the invocation of the attorney-client privilege or other privileges in future depositions or other discovery procedures to avoid answering questions propounded with respect to the illegal wiretapping activities." The record here does not show that Video Shack is entitled to such sweeping relief. Sound Video has not lost the attorney-client privilege entirely and future disputes over its assertion must be handled as they arise. Of course, if any such disputes arise, counsel should be prepared to defend their positions in light of this order.

### CONCLUSION

Video Shack's motion to compel is granted in part. Mr. Cohn and Mr. Chatz must answer questions about any communications with Mr. Gimbel (1) pertaining to any use of the intercepted communications in preparing and prosecuting this lawsuit, and (2) pertaining to any concealment of the wiretap transcripts. The motion is denied in all other respects.