UNION CARBIDE
CORPORATION, Plaintiff,

v.

The DOW CHEMICAL
COMPANY, Defendant.

Civ. A. No. 83–208 MMS.

United States District Court,
D. Delaware.

Aug. 12, 1985.
Reargument Denied Sept. 26, 1985.

E. Norman Veasey, Richards, Layton & Finger, Wilmington, Del., Paul W. Leuzzi, III, Stamford, Conn., for plaintiff; C. Frederick Leydig, Gordon R. Coons, and Bruce M. Gagala, Leydig, Voit, Osann, Mayer & Holt, Ltd., Chicago, Ill., of counsel.

Douglas E. Whitney, and Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant; Neal A. Waldrop, Neal A. Waldrop & Associates, P.C., Troy, Mich., of counsel.

OPINION

MURRAY M. SCHWARTZ, Chief Judge.

On April 15, 1983, Union Carbide Corporation ("Carbide") filed this action charging the Dow Chemical Company ("Dow") with infringement of U.S. Reissue Letters Patent No. Re. 28,715 and No. Re. 29,118, both relating to the production of elastic polyurethane products. In its amended answer and counterclaim, Dow has denied infringement of the patents and has challenged their validity on several grounds, including fraud and double patenting. (Defendant's Amended Answer and Counterclaims, Docket Item ("Dkt.") 34). Presently before the Court are two motions brought by Dow in relatively close succession. The first, a Motion to Compel the Production of Documents, seeks discovery of 262 allegedly privileged communications which Dow argues were prepared in furtherance of Carbide's fraud on the Patent Office or are otherwise non-privileged. The second, a Motion for Partial Summary Judgment, asserts the invalidity of Re. 28,715 on the basis of double patenting over Re. 29,118. For the reasons stated in this Opinion, Dow's Motion to Compel will be granted in part and denied in part, and its Motion for Partial Summary Judgment will be denied.

I. *The Patents and Their Procurement*

The patents in question relate to the preparation of polyurethane[1] by reacting an isocyanate[2] with a polymer[3] polyol[4] composition. In over-simplified terms, the reactive hydrogen group of the polymer/polyol composition reacts with the $-N=C=O$ radical of the isocyanate, producing polyurethane. The invention provides a relatively simple means of introducing a high molecular-weight, film-forming polymer into the production of polyurethane,

---

1. Polyurethane is a synthetic material characterized by the methane group $-NH \cdot CO \cdot O-$. It is used to produce a wide range of fibers, lacquers, adhesives and foams. *Hackh's Chemical Dictionary* 536 (4th ed. 1969) ("*Hackh's*").

2. An isocyanate is a compound containing the radical $-N=C=O$. *Id.* at 360.

3. A polymer is a substance composed of very large molecules, which consist essentially of recurring long chain structural units. *Id.* at 534.

4. A polyol is an alcohol containing three or more hydroxyl ($-OH$) groups. *The Condensed Chemical Dictionary* 836 (10th ed. 1981).

thereby yielding a product with improved properties.

For purposes of Dow's motions, a critical aspect of the invention lies in the formation of the polymer/polyol composition by polymerizing an ethylenically unsaturated monomer [5] "in situ," or within, a reactive polyol. (United States Patent No. Re. 29,-118, col. 5, lines 1–37 (Appendix to Dow's Brief in Support of its Motion to Compel Production of Documents, Dkt. 36A at A382)). This in situ polymerization permits the inclusion of a monomer which itself contains no reactive hydrogen groups but which will become reactive upon polymerization in a reactive solvent. (*Id.*). The use of solely non-reactive monomers in the production of polyurethane appears to have been a significant departure from the prior art. Since the properties of the resulting polyurethane vary with the nature of the monomers forming its base, the invention facilitated the manufacture of polyurethanes bearing novel and enhanced qualities.

Dr. Paul Stamberger, head of a small chemical company in Baltimore, Maryland, obtained two patents on this invention. He, in turn, granted an exclusive licensing agreement to Carbide, which now asserts its rights under the patents. Patent No. Re. 28,715 secures protection on the method of manufacturing the polymer/polyol compositions and on the compositions themselves. (Dkt. 36A at A362). Patent No. Re. 29,118 covers the method of using those compositions in the production of polyurethane, as well as the improved polyurethane product. (Dkt. 36A at A379). The reissue patents represent the culmination of a series of applications and amendments filed with the patent office in connection with the polymer/polyol concept.[6]

---

**5.** A monomer is a substance usually containing carbon and having a relatively low molecular weight and simple structure. *Id.* at 705. Its molecules can polymerize with like or unlike molecules. *Hackh's* at 436.

**6.** See note 6 on page 1040.

**6.** The complex genealogy of these patents may be traced in the following diagram:

The first of these applications was filed by Stamberger on November 28, 1961. Shortly before that date, Stamberger had met with a Carbide sales representative and displayed the results of some experiments he had performed at his laboratory in Baltimore. Carbide expressed interest in the research, but encouraged Stamberger to file a patent application before divulging further details of his work. Thus, Stamberger filed Application No. 155,467 ("Stamberger I") entitled "Polyurethanes and Methods for Their Production." The scope of this application is in dispute in this litigation. Dow contends that the application covered the production of polymer/polyols using reactive monomers only. Carbide, on the other hand, maintains that Stamberger I pertained to a generic invention for the manufacture of polymer/polyols using either reactive or non-reactive monomers.

Soon after Stamberger I was filed, Stamberger met with Carbide officials to discuss his research further. On December 27, 1981, Stamberger and Dr. L. Newton, a Carbide executive, signed a letter agreement giving Carbide a one-month option to negotiate a license with Stamberger. (Dkt. 36A at A92–93). The agreement included a clause preserving Carbide's "right to institute or prosecute patent interferences involving said patent application or any part thereof." (*Id.* at A93).

Meanwhile, Carbide was apparently conducting its own experiments in the production of polyurethanes. Stamberger was put in contact with Dr. William Kuryla, a Carbide chemist working in Charleston, West Virginia, and the two scientists continued their research at their respective locations. Although the extent of the interdependence of their efforts is unclear, it is evident that Stamberger remained in frequent contact with Kuryla and other Carbide associates and that substantial data was exchanged between the two concerns. On February 28, 1962, Carbide and Stam-

berger entered into a second agreement whereby Carbide obtained an option to acquire an exclusive license on Stamberger's patent applications covering the manufacture of reactive polyols useful in the production of polyurethane plastics. (Appendix to Carbide's Brief in Opposition to Motion to Compel, Dkt. 42A at CA479).

By August, 1962, an issue of inventorship had arisen concerning, as Carbide has termed it, an "improvement" made by Kuryla on Stamberger's invention. (Carbide's Brief, Dkt. 42 at 19; Fazio Deposition, Dkt. 42A at CA284–88). The parties to this litigation dispute both the substance of the Stamberger-Carbide conflict and the manner of its resolution. It is clear, however, that on February 6, 1963, Stamberger and Kuryla filed separate applications with the patent office ("PTO")[7] to protect their respective developments. Application No. 256,531 ("Stamberger II"), entitled "Polyurethanes, Reactive Solutions and Methods for their Production," was filed by Stamberger as a continuation-in-part ("C.I.P.") of Stamberger I. According to its specification, Stamberger II was broadly intended to teach "novel methods of forming polyurethanes which employ high molecular weight film-forming polymers in the polyurethane reaction." (Stamberger II at 4, lines 25–27 (Supplemental Appendix of Carbide File Wrappers, Dkt. 58A, Exh. C)). The invention was considered to have two essential aspects—the formulation of a novel reactive solution and the reaction of that solution with an isocyanate to form novel polyurethanes. (*Id.* at 6, lines 11–14). The reactive solution was itself to contain two critical components:

A relatively high molecular weight film-forming polymer having radicals which are reactive with the $-N{=}C{=}O$ radicals of the isocyanate used to form the polyurethane and a reactive solvent which is a solvent or dispersing medium for said polymer, and which also contains radicals

---

**7.** In 1975, the Patent Office became the Patent and Trademark Office. For convenience, this Opinion will not distinguish between the two

and will use "PTO" to signify the office under either name.

which are reactive with the isocyanate group. (*Id.*, lines 15–21). The Stamberger II application specifically explained that the film-forming polymer used in the invention could be formed from a monomer which contained an active hydrogen group that would react with the isocyanate group. (*Id.* at 9, lines 3–18). Alternatively, the polymer could be formed from a monomer which contained no active hydrogen, provided the monomer was polymerized in situ in the active-hydrogen-containing polyol. (*Id.* at 10, lines 4–7).

Kuryla's application, No. 256,529, entitled "Polyurethane Foams," was more narrowly focused. Like the Stamberger II application filed on the same day, it concerned the in situ polymerization of certain monomers to produce a polymer/polyol composition which was then capable of reacting with an isocyanate to produce polyurethane. (Application No. 526,529. (Dkt. 58A, Exh. B at 1)). However, Kuryla's invention used in the process only non-reactive monomers—"those which do not have a reactive hydrogen atom and/or are free of any groups which are reactive with the isocyanate radical of an organic isocyanate." (*Id.* at 2–3). According to the Kuryla specification, it was "surprising and unexpected that the polymer/polyol compositions would react with polyisocyanates to form polyurethanes, since it has not heretofore been considered possible to produce polyurethane compositions from starting materials containing high molecular weight polymers which did not have a reactive hydrogen atom." (*Id.* at 15).

As initially filed, the Kuryla application claimed a variety of polymer/polyol compositions including those formed with acrylonitrile, a compound which is used widely by Dow and which lies at the root of this litigation. On September 14, 1964, Kuryla filed an amendment to the application cancelling all claims to polymer/polyol compositions except those containing acrylonitrile. (*Id.* at 81). The Kuryla application further recommended that the hydroxyl range of the polyol be limited:

The polyols employed can have hydroxyl numbers which vary over a wide range. In general, the hydroxyl numbers of the polyols employed in the invention can range from about 20 and lower, to about 1000, and higher, preferably, from about 30 to about 600, and more preferably, from about 35 to about 450. (*Id.* at 8).

Kuryla explained that the polyurethanes produced in accordance with the invention would vary with the polyol employed. "For example, in the case of foamed reaction products the molecular weight of the hydroxyl number is selected properly to result in flexible, semi-flexible, or rigid foams." (*Id.* at 9). The inventive process could be used, according to Kuryla, to form polyurethanes suitable for surface coatings, elastomers, foamed products or the like." (*Id.* at 10).

Prosecution of the aforementioned applications continued to progress. On June 17, 1963, Stamberger I was amended to include unequivocally the use of non-reactive monomers within the scope of the invention. (Dkt. 42A at CA212–13). By December, 1963, Carbide had become aware that similar advances in the manufacture of polyurethanes had been made in Germany by Farbenfabriken Bayer Aktiengesellschaft, Leverkusen ("Bayer"). Carbide secured copies of the two pertinent Bayer patents—Patent No. 1,152,536, filed in Germany on March 30, 1962, and issued on August 8, 1963, and Patent No. 1,152,537, filed in Germany on June 2, 1962, and issued on August 8, 1963. (Dkt. 36A at A228; A216). The patents were translated and circulated for review among Stamberger and certain Carbide officials.

Shortly thereafter, on January 9, 1964, Carbide informed Stamberger it would exercise its option to take an exclusive license on Stamberger's invention in the field of polyurethane foam raw materials. (Dkt. 36A at A238). Carbide then began communicating with Stamberger concerning their patent strategy and raised as one of several possible courses of action the filing of "a new C.I.P. of [Stamberger's] original case

making it a combination of [the] original case, [the] C.I.P. and the Kuryla case." (*Id.* at A236).

On August 12, 1964, Stamberger filed Application No. 389,184 ("Stamberger III") entitled "Polyurethanes, Reactive Solutions and Methods and Their Production." (Dkt. 58A, Exh. D). That application was filed as a C.I.P. of both Stamberger I and Stamberger II. Again, the specification taught the in situ polymerization of a polymerizable, ethylenically unsaturated monomer in a reactive solvent and dealt with both reactive and non-reactive monomers. (*Id.* at 7, lines 11–23).

About four months later, on December 7, 1964, Stamberger filed a second amendment to Stamberger I, adding six claims directed to the in situ polymerization of non-reactive monomers and attempting to provoke an interference with any relevant Bayer applications which might have been filed in the United States (Dkt. 42A at CA217–218). In November, 1965, the Kuryla application was abandoned, and in January, 1966, Stamberger I was likewise abandoned. Stamberger II and Stamberger III remained pending in the PTO and prosecution of these applications continued.

Amendments to Stamberger II were filed on January 11, February 1, and February 24, 1966. On April 26, 1966, the PTO required restriction of Stamberger II to one of what it perceived to be two distinct inventions:

1) Claims 83–111 drawn to reactive polymers, solutions thereof and methods of preparing same; and

2) Claims 125–154 drawn to polyurethanes and methods of producing same.

(Dkt. 36A at A276). The PTO determined that restriction was appropriate since the inventions had acquired a separate status in the art and had divergent fields of search. The PTO further required an election between the following two species of claims:

1) polyurethane preparation by reaction with an organic polyisocyanate with a reactive composition comprising the *in situ* polymerizate of a monomer free of reactive radicals or containing reactive radicals in a polyfunctional reactive solvent.

2) polyurethane formed from a performed polymer of monomer having or not having reactive radicals, with an organic polyisocyanate in the presence of a polyfunctional reactive solvent.

(*Id.* at A277).

Stamberger elected to proceed on the second of the two inventions and the first of the two species. The PTO then rejected the remaining claims because, *inter alia*, it could find no patentable distinction between the products formed by Stamberger's process and the products formed in accordance with the prior art. (Dkt. 58A, Exh. C at 142–43). In response, Stamberger filed a detailed amendment to which he attached four affidavits attesting to the superiority of the products made pursuant to the Stamberger II specification, as amended. Stamberger noted in the concluding paragraphs of his response to the PTO, that after an interview with the patent examiner, "[t]he sole remaining question was whether applicant could satisfactorily show any superiority for the product which was not foam, i.e., the normal type of elastomers." (*Id.* at 165). Stamberger pointed to the affidavit of Dr. Kuryla which attested to the superiority of a polyurethane elastomer made with acrylonitrile. (*Id.* at 165, 178–81). The PTO thereafter determined that all remaining claims in the Stamberger II application were allowable. Patent No. 3,304,273 issued to Stamberger on February 14, 1967, covering "Methods of Preparing Polyurethanes From Liquid, Stable, Reactive, Film-Forming Polymer/Polyol Mixtures Formed By Polymerizing an Ethylenically Unsaturated Monomer in a Polyol." That patent was reissued on January 18, 1977, as Re. 29,118, ostensibly to reflect additional prior art which had been unknown to the applicant at the time of the patent's prosecution. The reissue patent expired on February 14, 1984.

On February 13, 1967, just one day before the patent on Stamberger II issued, Stamberger III was amended "for the purpose of reducing the number of claims consistent with the requirements for restriction and election as set forth in [Stamberger II]." (Dkt. 58A, Exh. D at 66). The amendment cancelled all the existing claims in Stamberger III and substituted claims to the reactive polymer/polyol compositions and its method of production. The new claims also contained a limitation on the polyol used in the process to one having "a hydroxyl number in the range of about 30 to about 600." (*Id.* at 62). This limitation had not been included in either of the earlier Stamberger applications, but had been referred to in similar terms in the Kuryla application [8] and had been incorporated in the experiments described in the four affidavits which were submitted in conjunction with the final amendment of Stamberger II. (*Id.*, Exh. C at 167–85).

The PTO concluded that the amended Stamberger III claims were unduly broad, obvious from the prior art, and in excess of the scope of the Stamberger II parent patent. That rejection was overcome by a further limitation to claim 53 of the application upon which the other claims were dependent, to define the polymerization as "free radical addition polymerization to a substantially linear polymer." (Dkt. 58A, Exh. D at 79–80). This change in the claim language was included in the patent specification by amendment of January 5, 1968. The remarks accompanying that amendment stated: "[t]he subject application is directed to divisible subject matter taken from two earlier co-pending applications of the same inventor. The broad statement of the invention [as originally set forth in the specification] fails however to reflect the divisional nature of this case." (*Id.* at 85). With that final change, Patent No. 3,383,351 issued on May 14, 1968.

The patent was reissued on February 17, 1976, to include:

i) amendments designed to clearly conform the claims to the disclosure of the parent and to the disclosure of the original patent; ii) amendments that are based on the discovery of certain patents not considered during the prosecution of the application which issued as the original patent and that involves the narrowing of claim 1 ... and iii) amendments based on the absence of certain specific claims from the original patent.

(Dkt. 58B, Exh. E at 39–40). The reissue patent expired on May 14, 1985, fifteen months after the expiration of Re. 29,118.

II. *The Motion to Compel Discovery*

The extensive discovery in this action has spawned disagreement over Carbide's obligation to produce 262 documents allegedly protected by the attorney-client privilege or work product immunity. For ease of review, the parties have grouped the documents into the following nine categories which roughly correspond to Dow's various arguments in support of its motion:

CATEGORY I—Documents Not Produced To Dow On The List Ordered Produced By Magistrate Hackett In Civil Action No. 670,333 on May 19, 1978

CATEGORY II—Documents Relating To Inventorship And The Simultaneous Filing On February 6, 1963 Of Applications On The Invention Of Kuryla Assigned To Carbide And The Invention Of Stamberger Under Which Carbide Had An Option To Become The Exclusive Licensee During The Period Between November 28, 1961 And February 6, 1963

CATEGORY III—Documents Relating To Inventorship Reflected By Prosecution Of Stamberger CIP Application Serial 256,531 And Kuryla Application Serial 256,529 During Period Between February 6, 1963 And The Filing Date Of Stamberger Second CIP Application Serial 389,384 On August 12, 1964

CATEGORY IV—Documents Relating To Inventorship During The Period Be-

---

**8.** The specification of the Stamberger III application contained, in language identical to that used in the Kuryla application, a discussion of the hydroxyl number of the polyol. (*See Id.* at 20, lines 1–23; Dkt. 58A, Exh. B at 8, lines 11–25 to 9, lines 1–11).

tween August 8, 1963 (Publication Of Bayer German Patents '536 And '537) And Abandonment of Stamberger Application Serial 155,467 On January 11, 1966

CATEGORY V—Documents Relating To The Filing In Serial 256,531 Of Affidavits Of Stamberger And Kuryla On August 10, 1966 In The Period Between December 1965 And September 1966

CATEGORY VI—Documents Relating To Prosecution Of Foreign Cognates Of Stamberger Application Serial 155,-467 And Kuryla Application Serial 256,529

CATEGORY VII—Documents Relating To Reissue Of U.S. Patents '273 And '351 In The Period Between May 1973 And January 1977

CATEGORY VIII—Carbide Documents Which Bear On The Issue Of Inventorship And Scope Of The Claims Of '273 And '351 Patents

CATEGORY IX—Non-Privileged Communications Between Carbide and Stamberger

Category I contains those documents which were found to be discoverable in an earlier suit between Carbide and BASF Wyandotte ("BASF") despite Carbide's assertion that the documents were privileged. Dow argues that the BASF decision, though issued by a United States Magistrate and not passed upon by a District Court judge, collaterally estops Carbide from relitigating the privilege issue in this Court. Alternatively, Dow asserts that the Magistrate's reasoning provides persuasive support for Dow's contention that the documents in Category I should be produced.

Categories II through VIII contain documents which Dow asserts were generated in furtherance of Carbide's fraud on the patent office and which therefore should not be shielded from Dow's examination. Category IX represents documents drawn from the eight preceding categories which involved communications between Carbide and Stamberger, a third party. Dow urges

that no attorney-client privilege attaches to such third-party dealings.

To facilitate the Court's resolution of the issues at bar, and to satisfy its burden under *International Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88 (D.Del.1974) (party asserting privilege must provide specific designation and description of documents, as well as precise reasons for preserving confidentiality), Carbide has submitted a brief description of each document, including its author and recipients. In addition, copies of the documents have been lodged with the Court for *in camera* review.

## A. *Collateral Estoppel*

Most of the documents at issue in this litigation were previously involved in an action between Carbide and BASF Wyandotte in the Eastern District of Michigan. In that suit, Carbide had similarly attempted to prevent BASF's examination of the documents on the basis of attorney-client privilege or work product immunity. The propriety of Carbide's claim was resolved in an opinion issued by United States Magistrate Barbara K. Hackett on May 17, 1979. The Magistrate concluded that the bulk of the documents were properly withheld from BASF's discovery, but that a small percentage of the communications—those which Dow has now compiled in Category I—fell outside the parameters of either the attorney-client privilege or the work product rule. *Stamberger v. BASF Wyandotte Corp.*, No. 6–70333 (E.D.Mich. May 17, 1978).

Both parties in the BASF case requested and were denied reconsideration of the Magistrate's order. Carbide then moved for modification of the earlier ruling. No decision was ever rendered on Carbide's motion since the case was dismissed with prejudice pursuant to the parties' stipulation. (Dkt. 42 at 40). Dow now maintains that the Magistrate's order should be given preclusive effect in the current action and the Category I documents should be ordered discoverable without further ado.

The parties agree that collateral estoppel applies only to final judgments, but differ as to whether the Magistrate's order may be considered final. Given the potential effect a decision in this area may have on the rights of future litigants, the issue is not one which should be passed upon lightly; yet neither party has offered any authority which is persuasive of its position. In any event, a review of the documents in question compels the conclusion that the Magistrate's determination was correct on the merits. I therefore decline to consider whether her decision should be afforded preclusive effect and turn instead to the substantive application of the attorney-client privilege and work-product doctrine to the documents in question.

### B. *Attorney-Client Privilege*

The attorney-client privilege, which dates back to the 16th century, is the oldest of the confidential privileges known to the common law. 8 J. Wigmore, *Evidence* § 2290 (McNaughton rev. 1961). Although created to protect the attorney's honor from the compelled violation of an attorney's oath of secrecy to his or her client, *id.*, it is now well established that the purpose of the privilege is to encourage the free exchange of information between attorney and client, thereby promoting "broader public interests in the observance of law and administration of justice." *Upjohn v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). It has thus been determined that the need to permit the attorney to provide sound legal advice generally outweighs any disadvantage of withholding evidence in a particular case. *See People's Bank v. Brown*, 112 F. 652, 654 (3d Cir.1902).

Nevertheless, because the attorney-client privilege is an exception to the rule favoring full disclosure between litigants, caution must be exercised to ensure that the privilege is contained within appropriate boundaries. *Cf. In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir.1979) (privilege must be "confined within narrowest possible limits consistent with the logic

of its principle"). To that end, the criteria set forth some thirty-five years ago in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950), continue to provide a useful tool in determining whether the privilege is applicable:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact which was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Id.* at 358–59. *Accord United States v. Boffa*, 513 F.Supp. 517, 523 (D.Del.1981); *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136, 144 (D.Del.1977).

The application of the privilege in patent litigation presents particular problems. Often patent attorneys perform not only the legal functions of preparing and prosecuting patent applications but evaluate the business ramifications of the company's patent position as well. While communications concerning the former enjoy insulation from discovery under the attorney-client privilege, communications with respect to the latter do not. *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. at 147. As Judge Wright explained in *Hercules*:

> If the primary purpose of a communication is to solicit or render advice on non-legal matters, the communication is not within the scope of the attorney-client privilege. Only if the attorney is 'acting as a lawyer'—giving advice with respect to the legal implications of a proposed course of conduct—may the privilege be properly invoked. In addition, if a communication is made primarily for the purpose of soliciting legal advice, an inciden-

tal request for business advice does not vitiate the attorney-client privilege.

*Id.*

█ Technical information, such as the results of research, tests, and experiments, communicated to the attorney primarily for aid in completing the patent application and not necessitating a legal opinion or interpretation are similarly devoid of protection. Such data is subject to a duty of full disclosure to the PTO and does not take on a confidential character merely because it is transmitted through an attorney. *Cf. Hercules,* 434 F.Supp. at 148 (attorney merely a conduit for such information to PTO).

█ When the "client" invoking the attorney-client privilege is a corporation, additional considerations come into play. Communications between employees and corporate counsel must be analyzed on a case-by-case basis in light of the principles underlying the privilege to determine whether the communications should be protected. *Upjohn v. United States,* 449 U.S. 383, 396–97, 101 S.Ct. 677, 686, 66 L.Ed.2d 584 (1981). Communications to counsel for the purpose of providing information on which the attorney may make an educated legal evaluation, as well as communications between the attorney and those who will act upon the legal advice, may generally be withheld from discovery. *Id.* at 390–91, 101 S.Ct. at 683; *see also James Julian, Inc. v. Raytheon Co.,* 93 F.R.D. 138, 141 (D.Del.1982). The confidential nature of the communication becomes a key factor in the court's evaluation. "The presence of nonessential third parties not needed for the transmittal of the information will negate the privilege." *James Julian, Inc.,* 93 F.R.D. at 141 (citing *Pitney-Bowes, Inc. v. Mestre,* 86 F.R.D. 444, 446 (S.D.Fla.1980)).

█ Communications between corporate counsel and individuals outside the corporation will not ordinarily be privileged even if the information is eventually conveyed by the attorney to the client. *Barr Marine Products Co. v. Borg-Warner,* 84 F.R.D. 631, 634 (E.D.Pa.1979). Third party communications do, however, retain a protective shield if the parties have a common legal interest, such as where they are co-defendants or are involved in or anticipate joint litigation. *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 513 (D.Conn.1976). As was stated in *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146 (D.S.C. 1974), "[t]he key consideration is that the nature of the legal interest be identical, not similar, and be legal, not solely commercial." *Id.* at 1172.

Dow points to two groups of communications, included in Categories I and IX of its list of disputed documents, which it contends do not fall within the above framework and should not be considered privileged. Category I contains those documents which were ordered produced by the Magistrate in the BASF litigation. As to those documents, Dow adopts the Magistrate's reasoning in support of its contention that the documents are discoverable. Category IX represents a compilation of communications between Carbide's counsel and Stamberger or Stamberger's attorney. Since these communications involve a third party, rather than Carbide and its attorney, Dow maintains that no privilege should attach.

█ Carbide has submitted an uncontroverted list denoting the role of each employee who either sent or received any of the disputed documents. (Dkt. 42A at CA174–205). This list has been consulted in conjunction with the Court's *in camera* inspection of the documents to determine whether they fall within the scope of the attorney-client privilege as outlined above. After careful review of the documents in question, the Court has determined that the following Category I documents are not privileged and must therefore be produced for Dow's review:[9]

---

9. Carbide has previously agreed to produce documents 32, 85, and 409. Accordingly, these documents were not submitted for *in camera* inspection and are not included in the Court's

discussion. Document 46 has apparently been erroneously included in Category I. Magistrate Hackett held this document was non-discoverable attorney work product. Since Dow's argu-

| Doc. No. | Description | Reason |
|---|---|---|
| 425 | Notes – November 13, 1962<br>By: Fazio, Esq. | summarizes technical data;<br>no legal advice or privileged information |
| 191 | Letter – December 11, 1962<br>From: Fazio<br>To: Simmons | business communication |
| 366 | Memo – December 17, 1962<br>From: Newton<br>To: Reding<br>cc: Powell, Kuryla,<br>Gates, Fazio | no attorney-client relationship |
| 428 | Notes – March, 1963<br>By: Fazio | no privileged information |
| 429 | Notes – May 3, 1963<br>By: Fazio | no privileged information |
| 399 | Letter – May 15, 1963<br>From: Newton<br>To: Stamberger<br>cc: Reding, Powell,<br>Fazio, Critchfield | no attorney-client relationship |
| 402 | Letter – July 18, 1963<br>From: Stamberger<br>To: Newton<br>cc: Critchfield, Fazio,<br>Kuryla, Powell | no attorney-client relationship;<br>primarily technical information |
| 403 | Letter – August 8, 1963<br>From: Stamberger<br>To: Newton<br>cc: Birch, Fazio | no attorney-client relationship |
| 431 | Notes – November 12, 1963<br>By: Fazio | no confidential information |
| 432 | Notes – January 9, 1964<br>By: Fazio | no confidential information |
| 433 | Notes – February 4, 1964<br>By: Fazio | no confidential information |
| 406 | Letter – April 30, 1964<br>From: Stamberger<br>To: Newton<br>cc: Fazio, Gates,<br>Simpson | technical information |
| 36 | Letter – January 12, 1965<br>From: Fazio<br>To: Stoops<br>cc: Hoaglin, Novan,<br>Smith, Cox,<br>Critchfield, Kuryla,<br>Platt, Rogers,<br>Tapp, Yarborough | no confidential information |

ment pertains only to those documents ordered produced by the Magistrate, document 46 has not been considered in the Court's analysis.

| Doc. No. | Description | Reason |
|---|---|---|
| 37 | Letter – April 6, 1965<br>From: Fazio<br>To: Stoops<br>cc: Cox, Critchfield, Hoaglin, Kuryla, Novan, Platt, Rogers, Tapp and Yarborough | no confidential information |
| 40 | Letter – June 2, 1966<br>From: Fazio<br>To: Kuryla<br>cc: Stoops | technical information only |
| 45 | Memo – March 8, 1973<br>From: Trautlein, Esq.<br>To: Simroth | technical information only |
| 16 | Draft Letter Agreement January 31, 1974<br>From: Trautlein<br>To: Stamberger<br>cc: Cozzi, O'Brien, Esq. | contract negotiations; no legal advice or privileged information |
| 463 | Notes – February 20, 1974<br>By: Trautlein | contract negotiations; no privileged information |
| 389 | Memo – March 14, 1974<br>From: Reding<br>To: Tomfohrde<br>cc: Trautlein, Karl, Esq. | primarily business information, no request for legal advice or communication of privileged information |
| 390 | Memo – June 12, 1974<br>From: Reding<br>To: Cozzi, Edwards, Ellis, Gates, Joesler, Karl, Langhart, Longmere, Mathewson, Mellinger, Milhikoff, Morgan, Suhr, Trautlein, Tomfohrde | primarily business information, no request for legal advice or communication of privileged information |
| 415 | Memo – September 25, 1974<br>By: Coons, Esq. | no attorney-client relationship or privileged information |
| 109 | Letter – October 1, 1974<br>From: Simroth<br>To: Trautlein<br>cc: Coons | primarily technical information |
| 72 | Letter – April 14, 1975<br>From: Trautlein<br>To: Simroth<br>cc: Coons, Lovell, Critchfield, Smith, Russell, Van Cleve, Whitman | seeks technical information only |

In addition, I find that the documents contained in Category IX fall outside the confines of the attorney-client privilege. These communications were transmitted prior to Carbide's decision to take a license under the Stamberger applications and do not reflect the joint pursuit of a common interest. Rather, most of the documents relate to an issue of inventorship that arose between Carbide and Stamberger (documents 420, 313, 421, 423, 190, 192, 199). It appears that the parties approached this issue at arms length, each asserting a position directly in conflict with the other. Likewise, documents 312 and 174 evince Stamberger's independent efforts to obtain patent protection on his invention, prior to any unified plan with Carbide. Thus, the kind of commonality of interest that would permit extending the attorney-client privilege to third parties is not present. *See SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 513 (D.Conn.1976). The Category IX documents must therefore be produced.[10]

### C. *Work Product Immunity*

■ When compared to the seasoned existence of the attorney-client privilege, the work product doctrine stands as a virtual newcomer to federal jurisprudence. It was not until the United States Supreme Court's decision in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), that the doctrine became firmly entrenched as an exception to the rule encouraging broad discovery in federal court litigation. The purpose of the work product doctrine, as articulated by the *Hickman* Court, is to permit the attorney to perform his or her duties without unnecessary interference

from opposing parties and their counsel. *Id.* at 510, 67 S.Ct. at 393. The doctrine protects the written record of an attorney's efforts, including statements, memoranda, correspondence, briefs, and mental impressions, obtained or prepared by an attorney with an eye toward litigation. *Id.* at 511, 67 S.Ct. at 393. As codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, documents prepared in anticipation of litigation or for trial may only be obtained by the adverse party "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." [11]

■ In the context of patent proceedings, work product immunity has been afforded to:

preliminary drafts of legal documents, license agreements and/or assignments, *Jack Winter, Inc. v. Keratron Co.*, [54 F.R.D. 44 (N.D.Cal.1971)]; opinion letters and background memoranda with respect to the scope and validity of patents and patent applications, *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, [62 F.R.D. 454 (N.D.Ill.1974), *aff'd*, 534 F.2d 330 (7th Cir.1976)]; *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, [47 F.R.D. 334 (S.D.N.Y.1969)]; attorney's analysis or assessments of a party's position with respect to other parties in an ongoing interference, *In re Natta*, 410 F.2d 187 (3d Cir.), [*cert. denied*, 396 U.S. 836, 90 S.Ct. 95, 24 L.Ed.2d 87 (1969)], and intra-office or file notes and memoranda containing

---

**10.** Documents 425, 191, 399, 402 and 403 appear in both Category I and Category IX. Since it has already been determined that these documents must be produced, no further discussion of them is warranted here.

**11.** Rule 26(b)(3) provides:

Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative ... only upon

a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

summaries of conferences, legal research and comments on technical information, prepared by outside patent counsel or patent department attorneys in connection with an interference. *Natta v. Zletz*, 418 F.2d 633 (7th Cir.1969). *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. at 151. Work product protection may be extended to documents prepared in anticipation of proceedings before the Board of Patent Interferences in the same manner that the doctrine would apply to documents prepared in anticipation of proceedings in a court of record. *In re Natta*, 410 F.2d 187 (3d Cir.), *cert. denied*, 396 U.S. 836, 90 S.Ct. 95, 24 L.Ed.2d 87 (1969); *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. at 151; *Sperry Rand v. International Business Machines Corp.*, 45 F.R.D. 287 (D.Del. 1968).

In this case, Carbide has invoked the work product doctrine to avoid production of six of the documents included in Category I, numbered 45, 103, 386, 387, 19, and 109.[12] Dow argues that just as Magistrate Hackett rejected Carbide's attempt to escape discovery on this theory in the *BASF* case, so should this Court conclude that the documents in question do not garner protection under the work product rule.

■ After careful scrutiny of each of these documents, it is apparent that none discloses the work product of Carbide's attorneys either in preparation for or anticipation of litigation. Rather, the communications are purely factual recitations of technical data and research experiments conducted by Carbide's employees. The fact that the documents were prepared by or forwarded to Carbide's in-house counsel does not, in itself, qualify the documents as attorney work product. *Cf. Natta v. Hogan*, 392 F.2d 686, 693 (10th Cir.1968) (a litigant "cannot hide behind the work product doctrine, the research, tests, and exper-

iments which are pertinent to the patent application"). Indeed, since none of the documents are legal in nature, work product immunity cannot apply. Document numbers 45, 103, 386, 387, 19, and 109 must therefore be produced for Dow's inspection.

### D. *Fraud*

■ An otherwise proper assertion of the attorney-client privilege or work product immunity will be vitiated by a showing that the documents claimed to be protected were prepared in furtherance of a crime or fraud. *See In re Grand Jury Proceedings*, 604 F.2d 798, 802–03 (3d Cir. 1979). The burden falls upon the party seeking discovery on this basis to prove first, a prima facie case of criminal or fraudulent conduct, and second, that the communications were made in furtherance of the fraud. *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. at 155.

■ Where the discovery dispute is grounded upon an allegation of fraud in the patent office, the decisions of the Court of Appeals for the Federal Circuit and its predecessor courts, the Court of Claims and the Court of Customs and Patent Appeals, provide the relevant framework.[13] A careful reading of the case law suggests that a patentee's conduct is evaluated under a different standard when the question is whether a claim of attorney-client privilege may be surmounted, rather than whether a patent may be declared unenforceable. In the latter instance, the Court of Appeals for the Federal Circuit has recognized that the high degree of candor imposed in patent proceedings compels the conclusion that a patent will be held unenforceable upon a showing of something less than common law fraud. *See Argus Chemical Corp. v. Fibre Glass-Evercoat Co.*, 759 F.2d 10 (Fed. Cir.1985); *J.P. Ste-*

---

**12.** Documents 45 and 109 have also been dealt with in connection with the attorney-client privilege. *See supra*, 1049.

**13.** The Court of Appeals for the Federal Circuit has exclusive jurisdiction over appeals in patent infringement cases. *See* 28 U.S.C. § 1295(a)(1).

The Federal Circuit has adopted the prior decisions of the Court of Customs and Patent Appeals and the Court of Claims as binding precedent. *See South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed.Cir.1982).

*vens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984). Thus a patentee who has engaged in inequitable conduct[14] during the patent's procurement will be unable to use the federal courts to enforce his or her rights under the patent.

 Where, as here, the question is not whether a patent is enforceable, but whether the protective shield of the attorney-client privilege may be pierced, the patentee's conduct must be measured against the traditional standard for fraud. In a patent action, that equates to a prima facie showing of 1) a knowing, willful, and intentional act of misrepresentation or omission before the patent office; 2) that is material; and 3) that the patent office relied upon in deciding to issue the patent. *American Optical Corp. v. United States*, 179 U.S. P.Q. 682, 684 (Ct.Cl.1973); *accord Research Corp. v. Gourmet's Delight Mushroom Co.*, 560 F.Supp. 811 (E.D.Pa.1983).

 The existence of fraudulent intent may be presumed upon proof of a knowing misrepresentation of a material fact, but may be rebutted at trial by a showing of the applicant's good faith. *American Optical*, 179 U.S.P.Q. at 684. Materiality is established where the misrepresented or withheld information relates to the subject matter of the claims. *Id.* Reliance is generally exhibited by satisfaction of a "but for" test—but for the omission or misrepresentation, the claims would not have been allowed. *Id.*

 Each of these elements must be established by at least prima facie evidence. "'[W]hile a prima facie showing need not be such as to actually prove the disputed facts, it must be such as to sub-ject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted.'" *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. at 155 (quoting *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215 (4th Cir.1976)).

 Once a showing of fraudulent conduct is made, it is then necessary to determine whether the documents were prepared in furtherance of the fraud. As Judge Wright explained in *Hercules, Inc., supra:*

> Communications made before the fact of or during the commission of a fraud are not protected, since to allow protection would permit an attorney to be a principal or accessory to a fraud without fear of discovery and would permit the client to commit the fraud with the aid of legal advice beforehand. Communications after the fact are still protected, however, since one of the primary purposes of the attorney-client privilege is to allow consultation in the interest of establishing a legal defense. *Burlington Industries v. Exxon Corp.*, [61 F.R.D. 26 (D.Md. 1974)]; *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1172.

*Hercules, Inc.*, 434 F.Supp. at 155.

 In resolving disputes of this nature, courts often call for *in camera* inspection of the documents in question. There is a divergence of opinion, however, with respect to whether the allegedly privileged communications may be considered in the determination of whether a prima facie case of fraud has been established. *Compare In re Berkley & Co.*, 629 F.2d 548, 553 n. 9 (8th Cir.1980) (privileged documents may be considered in the fraud analysis), *and Duplan Corp. v. Deering*

---

**14.** Inequitable conduct may be demonstrated by clear and convincing evidence of a "failure to disclose material information or submission of false material information with an intent to mislead." *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984). It is not necessary to establish that the PTO relied upon the misrepresentation or omission. Rather, information will be considered material if there is a "'substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.'" *Argus Chemical Corp. v. Fibre Glass-Evercoat Co.*, 759 F.2d 10, 14 (Fed.Cir.1985) (quoting PTO Rule 1.56(a), 37 C.F.R. § 1.56 (1977)). Moreover, deliberate scheming need not be evidenced; where a strong showing of materiality is made, it will be sufficient to prove that the information was either omitted or inaccurately presented as a result of gross negligence. *J.P. Stevens*, 747 F.2d at 1560; *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed.Cir.1983).

*Milliken, Inc.*, 397 F.Supp. 1146, 1194–95 (D.S.C.1974) (same); *with United States v. Shewfelt*, 455 F.2d 836, 840 (9th Cir.) (independent evidence of fraud must be adduced before privileged documents may be ordered produced), *cert. denied*, 406 U.S. 944, 92 S.Ct. 2042, 32 L.Ed.2d 331 (1972); *Kockums Industries, Ltd. v. Salem Equipment, Inc.*, 561 F.Supp. 168, 191 (D.Or. 1983) (same); *United States v. Schlegel*, 313 F.Supp. 177, 180 (D.Neb.1970) (same). That issue need not be resolved at present since it is clear from the independent evidence adduced by Dow, viewed in conjunction with those documents which the Court has determined are not properly privileged (documents in categories I and IX), that a prima facie case of fraud has been shown.[15]

The evidence suggests that the research efforts of Stamberger and Kuryla yielded two related but distinct developments in the manufacture of polyurethane. The first of these developments was a generic process for the in situ polymerization of a monomer in a polyol. As between Stamberger and Kuryla, and without regard to patentability over prior art, this "invention" was properly credited to Stamberger and claimed in the Stamberger I and II applications.

A significant improvement on this basic process allowed for its adaptation to the manufacture of polyurethane using acrylonitrile. That improvement was, according to the evidence, attributable to Kuryla's research and was represented to the patent office in the application filed under Kuryla's name.[16] Upon learning of the similar Bayer patents, Carbide apparently recognized that its opportunity to obtain a patent on the Kuryla improvement was in jeopardy. It was then that Carbide exercised its option to take a license under the Stamberger applications and supervised the filing of Stamberger III, incorporating such features from the Kuryla application as the limitation on the hydroxyl number of the polyol.[17] Carbide has been unable to satis-

---

15. It must be emphasized that the Court today decides only that there is a prima facie showing of fraud on the patent office and not that there has been actual fraud. The Court's assessment of the latter issue must await trial on all the evidence.

16. Among the documents which the Court has held are discoverable, several are pertinent to the fraud analysis. Document 425, which essentially recounts certain research efforts, states, "Simmons, [Stamberger's attorney] felt that Kuryla was properly the sole inventor of any acrylonitrile polymers in which there was no reactive radical capable of reacting with the –NCO radical; except for the isoprene and butadiene monomers." On July 18, 1963, Stamberger wrote a letter to a Carbide executive relating, "acrylonitrile and as I have learned now in Charleston [where Kuryla was working] Vinylchloride also should be covered individually, since, both represent colloidal dispersions with discrete particles and particle size outside the particle size range of viscous polymer solutions. The difference is today far more distinct than it was when Bill Kuryla's patent application was made.... We all agreed that this matter should be given new consideration and covered with a separate patent application." Document 402. In another letter dated August 8, 1963, Stamberger discussed the substance of the Kuryla application. He states, "[t]he fact that Carbide and myself worked jointly in the field and exchanged information verbally or in correspon-

dence and in reports warrants a claim for joint inventorship." Document 403.

The Court does not decide whether Kuryla's "invention" covered use of other non-reactive monomers which were subsequently included in the Stamberger patents. It is sufficient for purposes of this motion that there is prima facie proof that Carbide misrepresented the inventor of the use of acrylonitrile in the process.

17. Shortly after Carbide learned of the Bayer patents, a letter was written to Stamberger which states, in pertinent part:

On re-filing in the United States, four possibilities occurred *to* us.
1. To combine the Kuryla case with your original case and include in this combination, without reference, some examples from your C.I.P. In such case, your C.I.P. could eventually be abandoned or could be re-filed to cover your polymer mixtures concept.
2. To file a new C.I.P. of your original case making it a combination of your original case, your C.I.P. and the Kuryla case.
3. To file a combination of your C.I.P. and the Kuryla case and to allow your original case to stand as is.
4. To leave the cases as they are at the moment....
On your German case, since it is filed in the name of the assignee, we will file a supplemental application including the acrylonitrile work of Kuryla. By pointing out that this information involves the same inventive con-

factorily rebut the inference that it continued to rely on Kuryla's research and ideas while representing to the patent office that such data was the product of Stamberger's efforts and thus was entitled to the early filing date of the Stamberger I application.[18]

The question remains whether such a misrepresentation of inventorship constitutes fraud on the patent office. In other words, was Carbide's act a "knowing, willful and intentional act of misrepresentation or omission" that was material, and upon which the PTO must have relied in issuing the patents? *See American Optical,* 179 U.S.P.Q. at 684. Based on the facts presented, that question must be answered affirmatively.

First, Carbide's intent to defraud the PTO may be presumed from the proof that it knowingly misrepresented the inventor of the acrylonitrile process. Second, the materiality of the issue of inventorship is evident under the provisions of the patent act. In particular, 35 U.S.C. § 102(f) states, "[a] person shall be entitled to a patent unless—he did not himself invent the subject matter sought to be patented."

That principle is also embodied in 35 U.S.C. § 115 which requires the applicant to "make oath that he believes himself to be the original and first inventor of the process, machine, manufacture or composition of matter, or improvement thereof, for which he solicits a patent." Finally, the PTO's reliance on Carbide's misrepresentation is obvious—patents of like scope would not have issued to Stamberger but for the assertion that the information contained in the applications were proper representations of Stamberger's work.

It remains only for the Court to consider whether the documents in question were prepared in furtherance of the alleged fraud. *See Hercules, Inc. v. Exxon Corp., supra.* Dow has contended, and the Court agrees, that the first indication of the fraudulent scheme appeared on January 9, 1964, when Carbide apparently seized its opportunity under the Stamberger applications to skirt any potential issues of priority between Kuryla and the Bayer invention. Consequently, any documents produced prior to January 9, 1964, were not made in furtherance of the fraud.[19] Thus,

---

cept as your earlier application, we hope to establish the date of your earliest filing.
Dkt. 36A at 236–37.

**18.** Carbide's reliance on Kuryla's acrylonitrile discovery to procure a patent under Stamberger's name is evident, for example, in the final amendment of Stamberger II. Carbide successfully used an affidavit, signed by Kuryla, and recording the production of an acrylonitrile elastomer, to convince the patent office that the application disclosed the production of patentably novel products. Dkt. 58A, Exh. C at 165, 178–81.

**19.** Although Dow indicated in its opening brief that the fraudulent scheme began on January 9, 1964, it has sought production of documents created prior to that date. Dow relies on Judge Wright's observation in *Hercules, Inc. v. Exxon Corp., supra,* that "communications made before the fact of or during the commission of a fraud are not protected." 434 F.Supp. at 155. Dow's interpretation of Judge Wright's language sweeps too broadly. Judge Wright was specifically describing communications made *in furtherance of* the fraud. Thus, contacts with an attorney made prior to the actual implementation of the fraudulent scheme, but made for the

purpose of determining how the scheme could most effectively operate were included in his discussion. As a matter of policy, such "before the fact" communications garner no protection from discovery, "since to allow protection to attach ... would permit an attorney to be a principal or accessory to a fraud without fear of discovery and would permit the client to commit fraud with the aid of legal advice beforehand." *Id.* That is not to say that communications transmitted *prior to the inception* of the fraudulent scheme similarly lose their privileged character. Consequently, documents prepared at or subsequent to the January 9, 1964, joining of forces between Carbide and Stamberger are discoverable under the fraud exception to the attorneyclient privilege, whereas documents prepared prior to that date continue to be immune from discovery.

Equally meritless is Dow's alternative attempt to obtain these early documents because they relate to circumstances surrounding the beginning of the scheme or are the "res gestae" for the fraud. The purpose of the fraud exception is not to enable the litigant to obtain otherwise privileged background information to facilitate *proof* of fraud, but to prevent the preparer of the documents from effectuating such misconduct, safe in the knowledge that the communi-

the documents in Category II,[20] as well as documents 318, 319, 242, 320, 243, 321, 244, 350, 86, 247, 249, 89 and 250 in Category III, and documents 1122, 368, 1172 and 372 in Category IV do not fall within the fraud exception to the attorney-client privilege.

With the issuance of Patent No. 3,383,-351 on May 14, 1968, the alleged fraudulent scheme was complete. Documents prepared after that date are therefore not discoverable under the fraud exception.[21] Documents prepared in the period between January 9, 1964 and May 14, 1968 have been carefully scrutinized. Many of these deal with patents other than the two involved in this litigation. Others, while relating to the patents in issue, do not touch upon the alleged fraudulent scheme and were not in furtherance thereof. The following documents do, however, relate directly to Carbide's advancement of its alleged fraudulent purposes and must be produced for Dow's inspection: [22]

| | Document No. |
|---|---|
| Category III | 251, 252, 253, 91, 1202, 322, 92, 258, 261 |
| Category IV | 375, 296, 2126, 35, 490, 194, 324, 202, 325, 327, 328, 38, 1141 |
| Category V | 97, 184 |

cations in furtherance thereof will not be disclosed.

20. Some of the documents in Category II are also enumerated in Category IX. The Court has previously determined that the Category IX documents are not privileged. *See supra,* 1050. The documents which appear in both categories must be produced by Carbide and have not been considered in this portion of the Court's Opinion.

21. Dow seeks production of documents prepared after May 14, 1968, on the grounds that Carbide's fraud continued through the reissue proceedings since Kuryla's work was again presented to the examiner without reference to its true inventor. (Dkt. 36 at 25). However, with the issuance of the patent on Stamberger III, Carbide had succeeded in establishing that the invention(s) embodied in Stamberger II and III were indeed Stamberger's. Any fraudulent scheme with respect to inventorship was therefore complete. The reissue proceedings centered not upon whether the invention(s) claimed in Stamberger II and III were a product of Stamberger's, rather than Kuryla's, efforts, but

## III. *Dow's Motion for Summary Judgment*

In a separate motion, Dow seeks a declaration from this Court that Patent No. Re. 28,715 is invalid on the basis of obvious-type double patenting over Patent No. Re. 29,118.[23] Although Carbide vehemently contests the obviousness issue, its primary response to Dow's motion rests upon statutory, rather than doctrinal grounds. Essentially Carbide asserts the patents in question are descendants of the broad Stamberger II application which the PTO ordered restricted to a single invention.[24] Carbide argues that where such a requirement to restrict has been made, 35 U.S.C. § 121 bars reliance upon the patent application or the patent itself to support a double patenting rejection of its divisional offspring.

Dow counters that section 121 was not intended to shield a divisional patent from double patenting scrutiny. Moreover, even if section 121 is held to carve out an exception to the double patenting doctrine, Dow contends that exception would extend only to a divisional application filed *after* the PTO issues its requirement to restrict. Since the application from which Re. 28,715 ultimately issued predates the restriction

upon whether the inventions were patentably distinct from other prior art.

22. Dow also alleges Carbide committed a second fraud in that results of certain experiments were withheld from the PTO. The Court finds it unnecessary to consider whether Dow has made a prima facie case of fraud on this basis since *in camera* review of the documents not otherwise held to be discoverable reveals that none can be said to have been prepared in furtherance of this purported fraud.

23. Dow initially charged Carbide with both same invention and obvious-type double patenting. At oral argument, Dow abandoned its same invention theory and elected to proceed solely on the basis of obvious-type double patenting. (Transcript of Oral Argument on Motion for Partial Summary Judgment, Mar. 22, 1985, Dkt. 59 at 21–22).

24. Re. 29,118 is the reissue patent of Patent No. 3,304,273 which issued directly on the Stamberger II application; Re. 28,715 represents the reissuance of Patent No. 3,383,351 resulting from the Stamberger III application which, in turn, existed as a division of Stamberger II.

requirement, Dow maintains that section 121 does not operate to provide Carbide's patent with the desired protection. Finally, although Dow concedes that the application on which Re. 29,118 was predicated was subjected to a restriction requirement, Dow suggests that the claims of Re. 28,715 have been changed materially from the claims upon which the requirement was based. Consequently, any protection which section 121 may otherwise provide should not be afforded to Carbide's patent.

The parties' dispute centers upon the interpretation of the third sentence of 35 U.S.C. § 121. That sentence may best be analyzed in the context of the provision as a whole:

> If two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of section 120 of this title it shall be entitled to the benefit of the filing date of the original application. *A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application.* If a divisional application is directed solely to subject matter described and claimed in the original application as filed, the Commissioner may dispense with signing and execution by the inventor. The validity of a patent shall not be questioned for failure of the Commissioner to require the application to be restricted to one invention.

35 U.S.C. § 121 (1984) (emphasis added).

While the intent of the third sentence may appear clear on its face, those courts that have considered its meaning have reached different results. In several early decisions, the Court of Customs and Patent Appeals seemed to suggest that a patent resulting from a requirement to restrict is immune from a double patenting rejection premised upon the existence of its parent. For example, in *In re Schneller*, 397 F.2d 350 (C.C.P.A.1968), the court proceeded to the merits of the double patenting inquiry because there had been no requirement to restrict "as provided in 35 U.S.C. § 121 to excuse [the filing of two applications]." *Id.* at 355. Similarly, in a concurring opinion in *In re Zickendraht*, 319 F.2d 225 (C.C.P.A.1963), Judge Rich observed,

> the operation of the rule [of double patenting] is that claims to inventions closely related to the invention claimed in a patent and not patentably distinguishable therefrom must be included in the same patent unless the applicant has been forced to make them in a separate application by a requirement of restriction, in which case section 121 of the statute acts to waive the rule.

*Id.* at 232. *See also In re White*, 405 F.2d 904, 905 n. 2 (C.C.P.A.1969). Subsequently, however, the Court of Customs and Patent Appeals made clear that the effect of section 121 on the double patenting doctrine is far from settled. *See In re Ziegler*, 443 F.2d 1211, 1214 (C.C.P.A.1971).

At the district court level, only the Northern District of Illinois has ruled definitively that section 121 does not obviate the need for a double patenting analysis when the PTO has ordered restriction. In *Studiengesellschaft Kohle mbH v. Northern Petrochemical Co.*, 225 U.S.P.Q. 194 (N.D.Ill.1984) ("*SGK v. Petrochemical*"), the court concluded that use as a "reference" under section 121 did not include use of the claims of an expired patent to show it was for the same invention as a second patent. Slip op. at 19. Accordingly, the court invalidated a later issued patent for double patenting over an earlier patent, notwithstanding a finding that both were the product of a requirement to restrict and that a line of division had been main-

tained between the two. The court's opinion relies upon the double patenting decision of the Eastern District of Texas in *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 450 F.Supp. 1211 (E.D.Tex.1977), *aff'd in part and rev'd in part*, 616 F.2d 1315 (5th Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980) (*"SGK v. Kodak"*). It is noteworthy, however, that despite the factual similarities between the two cases, the *SGK v. Kodak* opinion makes no reference to section 121 nor to a requirement of restriction.[25]

In *Eversharp Inc. v. Philip Morris, Inc.*, 256 F.Supp. 778 (E.D.Va.1966), *aff'd per curiam*, 374 F.2d 511 (4th Cir.1967), the court suggested in dicta that section 121 does not preclude use of a parent patent to support a double patenting rejection of a divisional patent. The court's primary authority in that case was the Fourth Circuit's decision in *Remington Rand Business Service, Inc. v. Acme Card System Co.*, 71 F.2d 628, 633 (4th Cir.), *cert. denied*, 293 U.S. 622, 55 S.Ct. 236, 79 L.Ed. 710 (1934), issued almost two decades before section 121 was enacted.

In the PTO and its tribunals, a contrary rule has been adopted. The Patent Office Board of Appeals has expressly prohibited rejection of a divisional application, filed as a result of the PTO's requirement to restrict, based upon double patenting over the parent. *See Ex parte Camarata*, 151 U.S.P.Q. 739, 739 (Pat.Off.Bd.App.1966); *Ex parte Nantz*, 141 U.S.P.Q. 523, 529 (Pat.Off.Bd.App.1963); *see also In re Joyce*, 115 U.S.P.Q. 412, 412 (Comm'r of Pat. 1957).[26] This latter approach finds support in the legislative history of the

---

**25.** The Illinois and Texas actions involved different patents issued to the same inventor on related subject matter. The *SGK v. Petrochemical* court stated that section 121 was raised in the *SGK v. Kodak* action. Since the *SGK v. Kodak* opinion makes no mention of section 121 and does not indicate whether the patents in question stemmed from a restriction requirement, the substance of the section 121 argument and the court's reason for rejecting that argument are unknown.

**26.** The Manual of Patent Examining Procedure ("MPEP") engrafts a similar reading upon section 121 and imposes a concomitant duty on the examiners to exercise caution in requiring restriction and in applying the mandates of the statute. At the time the patents involved in this litigation were pending, section 804.01 stated:

35 U.S.C. § 121, third sentence, provides that where the Office requires restriction ... the patent of either the parent or any divisional thereof conforming to the requirement cannot be used as a reference against the other. *This apparent nullification of double patenting* as a ground of rejection or invalidity in such cases imposes a heavy burden on the Office *to* guard against erroneous requirements for restriction where the claims define essentially the same inventions in different language and which, if acquiesced in, might result in the issuance of several patents for the same invention.

The apparent nullification of double patenting as a ground of rejection or invalidity raises many troublesome questions as to meaning and situations where it applies.

A. Situations Where the Double Patenting Protection Under 35 U.S.C. § 121 Does Not Apply

(a) The applicant voluntarily files two or more cases without requirement by the examiner.

(b) The claims of the different applications or patents are not consonant with the requirement made by the examiner, due to the fact that the claims have changed in material respects from the claims at the time the requirement was made.

(c) The requirement was made subject to the nonallowance of generic or other linking claims and such linking claims are subsequently allowed.

MPEP § 804.01 (3d ed. 1961) (emphasis added). Section 804.01 has since been amended in a manner not material to the issue at bar. MPEP § 804.01 (1978 Rev.).

*Section 803.01 is also pertinent to this inquiry.* That section provides:

Since requirements for restriction under Title 35 U.S.C. § 121 are discretionary with the Commissioner, it becomes very important that the practice under this section be carefully administered. Notwithstanding the fact that this section of the statute apparently protects the applicant against the dangers that previously might have resulted from compliance with an improper requirement for restriction, IT STILL REMAINS IMPORTANT FROM THE STANDPOINT OF THE PUBLIC INTEREST THAT NO REQUIREMENTS BE MADE WHICH MIGHT RESULT IN THE ISSUANCE OF TWO PATENTS FOR THE SAME INVENTION. Therefore to guard against this possibility the primary examiner must personally review and sign all final requirements for restrictions.

MPEP § 803.01 (3d ed. 1961).

statute. Section 121 was drafted at a time when the patent office's imposition of a restriction requirement was subject to judicial review for abuse of discretion. *See Steinmetz v. Allen,* 192 U.S. 543, 560–61, 24 S.Ct. 416, 421, 48 L.Ed. 555 (1904). It was then not uncommon for the claims of a divisional application to be held invalid on double patenting grounds even though the application was the product of a requirement to restrict. Although that practice was viewed as somewhat unfair, courts rationalized that the applicant could have challenged the restriction requirement and thus avoided such inconsistent results. *See generally* Killworth, *Unity of Invention in Patents,* 54 J.Pat.Off.Soc'y 226 (1972); 3 Chisum, *Patents* § 12.05 (1985).

The initial draft of what ultimately became section 121 presented a departure from the existing practice. The draft provision eliminated the right to appeal a restriction requirement and limited the term of a divisional patent so that the parent and divisional patents would expire simultaneously. Federico, *Proposed Revision and Amendment of the Patent Laws,* Preliminary Draft with Notes, House Comm. on

the Judiciary § 36 (Comm. Print 1950).[27] Section 36 of that draft also specified, "[i]f two or more patents are issued in consequence of a requirement for restriction under this section, no claim of any of said patents may be held invalid solely by reason of its inclusion in a separate patent."[28] *Id.*

Section 36 of the preliminary draft was revised and renumbered as section 120 of H.R.9133, introduced in the 81st Congress, and later, as section 120 of H.R.3760, introduced in the 82d Congress. The revised drafts omitted the limitation on the term of a divisional patent and narrowed the prohibition against use of a patent as a reference in determining the validity of a divisional application or patent: "If two or more patents are issued in consequence of a requirement for restriction under this section, neither patent may be used as a reference against the other *for the purpose of section 103 of this title.*" H.R. 9133, 81st Cong., 2d Sess. § 120 (1950); H.R..3760, 82d Cong. 1st Sess. § 120 (1951) (emphasis added).

A final draft of the provision appeared as section 121 of H.R.7794 and was enacted

---

**27.** Section 36 of the preliminary draft stated, in pertinent part:

> If two or more independent or distinct inventions are claimed in one application the Commissioner *may in his discretion* require the application to be restricted to one of the inventions, and the other invention or inventions may be made the subject of one or more divisional applications. A divisional application shall be entitled to the benefit of the filing date of the original application if it complies with the requirements of section 35 of this title, and in such event shall also be subject to the restriction in term specified in section 35 of this title.

Federico, *Proposed Revision and Amendment of the Patent Laws,* Preliminary Draft with Notes, House Comm. on the Judiciary § 36 (Comm. Print 1950) (emphasis added). Section 35 of the draft provided that an application filed as a continuation would be given the filing date of the parent application and any patents issuing therefrom would expire together. The note to section 35 stated, "[d]ivision is made discretionary with the Commissioner, hence there will be no appeal to the Court." *Id.* § 35 (Comm.Print. 1950).

**28.** P.J. Federico who worked on the preliminary draft of the 1952 revision of the patent laws has

stated the following with respect to the preparation of section 36:

> The motive for including section 36 in the draft resided in the concern which had been felt over an unfair result which could arise and had arisen from the division practice of the Patent Office. The examiner could require an applicant to divide his application, alleging that the claims were directed to different inventions. Thereafter the two were separated, retaining one set of claims in the first application and filing a second application for the other, and after a patent had issued on the first, the examiner (presumably a different examiner) could reject the claims of the second application on the basis of the claims of the now patented first application, on the ground of socalled "double patenting." Also, if this was not done by the examiner and a second patent issued, it could be held invalid over the first on that ground by a court. The third sentence of the draft section was included to prevent such results, to protect an applicant or patentee against possible errors of the Patent Office or the possibility of subsequent change of opinions.

(Federico Affidavit, Dkt. 53A at CA303).

into law on July 19, 1952. Like the two preceding bills, section 121 as enacted contains no requirement that a divisional patent be coterminous with its parent. The provision does, however, reinstate the broad prohibition contained in the original draft against use of parent and divisional applications or patents as references against each other.[29] The Reviser's Note accompanying section 121 explains:

> This section enacts as law existing practice with respect to division, at the same time introducing a number of changes. Division is made discretionary with the Commissioner. The requirements of section 120 are made applicable and neither of the resulting patents can be held invalid over the other merely because of their being divided in several patents.

35 U.S.C. § 121 (Reviser's Note).

The foregoing history compels the conclusion that the third sentence of section 121 was intended to apply to a double patenting analysis. First, the addition of language in the interim drafts which would have limited the effect of section 121 to a prior art determination, followed by the deletion of that language in the final draft, reflects an intent to broaden section 121's proscription.

Moreover, the third sentence of section 121 would have been superfluous were it intended to apply only to determinations of prior art and not to double patenting. Copending applications have never been considered prior art to one another, irrespective of whether a requirement to restrict is involved. *See* Killworth, *supra* p. 42, at 233 and cases cited therein; 3 Chisum, *supra* p. 42, at 12–72. A statute codifying this principle in the context of the restriction practice would thus have been unnecessary. There was, however, a need to rectify the inequities resulting from contradictory restriction and double patenting decisions, particularly if the right to appeal a restriction decision was to be eliminated. Given the clear congressional desire to make a restriction decision unreviewable while the patents are pending, it is doubtful

Congress envisioned that decision could, in effect, be overturned under a double patenting analysis after the patents had issued and the patentee's ability to remedy the defect was drastically reduced.

▋ Of course, this interpretation of section 121 countenances the existence of two patents belonging to a single inventor and disclosing but one invention because of what in reality was an erroneous restriction. However, I can only assume that this hazard was weighed in the legislative process against a host of competing policies. If it was Congress' determination that the need to streamline the patenting process and remove some of the pitfalls that plagued patentees outweighed the disadvantage of permitting two like patents to coexist, it is not for the Court to second guess the wisdom of that determination. I therefore hold that section 121 prohibits, as its language implies, the use, as a reference for double patenting purposes, of a parent application or patent against a divisional application or patent filed as a result of a requirement to restrict.

That determination, does not, however, end this Court's inquiry, for Dow contends that in any event, the patent in question did not issue on an "application filed as a result of ... a requirement" for restriction, as specified in section 121. Although Dow concedes that such a requirement was made with respect to Stamberger II, it emphasizes that the application from which the Stamberger III patent issued was filed prior to the date of that requirement. Hence, Stamberger III, and consequently its reissue patent, are arguably not protected by the literal language of section 121 and are not immune from double patenting attack.

▋ There is no question that Stamberger III was "filed," in the sense that an application was placed on record with the PTO and an application number assigned, before restriction of Stamberger II was ordered. Following restriction, however,

**29.** *See supra* 1056 for the text of section 121.

the pending claims of Stamberger III were cancelled in their entirety and new claims were added to reflect those deleted from Stamberger II because of the PTO requirement. With the filing of the Stamberger III amendment, the PTO was apprised that such action was taken pursuant to the office's requirement for restriction. Where, as here, the claims of an application are amended in toto to reflect the division of a copending application, I conclude that the amended application is one "filed as a result of such a requirement" as set forth in section 121. No practical distinction exists between an application filed for the first time as a result of a restriction requirement, and an application which is amended in full to comport with that requirement. I am therefore not convinced that section 121 was intended to include only the former and decline to limit the statute's application based on a formalistic rule.

■■■ Dow's final attempt to bring Re. 28,715 outside the scope of section 121 focuses on the precise nature of the PTO's restriction requirement and Carbide's response thereto. Dow argues that the claims of Re. 28,715 have been changed materially from those in the Stamberger II application which prompted the restriction decision. The PTO's instruction, however, broadly compelled a division between on the one hand, claims to the preparation of a polymer/polyol composition and the composition itself, and on the other hand, claims to the preparation of polyurethane and the polyurethane product. The file wrapper reflects that that line of division was maintained throughout the prosecution of the patents in issue. Dow does not dispute this fact, but argues that the inclusion of a particular hydroxyl range in the Stamberger III claims which did not appear in the Stamberger II application constitutes a material change which renders section 121 inapplicable. Dow's argument is, however, unpersuasive. It is almost inevitable that some refinement of the claims will occur after restriction is ordered, since restriction often comes as a preliminary step before the examiner reaches the merits of the patent claims.[30] What is critical then, is that the distinction which prompted the PTO to require restriction because of the existence of more than one invention is retained in the divisional patent. Since that has clearly occurred here, the protection provided by section 121 has not been defeated. Accordingly, Dow's motion for summary judgment must be denied.

An order will be entered consistent with this Opinion.

## ON MOTION FOR REARGUMENT

Plaintiff has filed a timely motion for reargument of the central issue contained in defendant's motion to compel discovery—whether the attorney-client privilege has been vitiated by a prima facie showing of fraud in the patent office. The Court's grounds for granting defendant's motion were set forth in detail in its Opinion dated August 12, 1985. Although the Court continues to adhere to the reasoning and conclusions expressed in that Opinion, plaintiff's motion for reargument mentions one issue which merits further discussion.[1]

---

30. Section 806.02 of the MPEP provides:

For purposes of a decision on the question of restriction, and for this purpose only, the claims are ordinarily assumed to be in proper form and patentable (novel and unobvious) over the prior art.

This assumption, of course, is not continued after the question of restriction is settled and the question of patentability of the several claims in view of prior art is taken up. MPEP § 806.02 (5th ed. 1983). This provision also appeared in the third edition of the MPEP, published in 1961 and in effect when these patents were pending.

1. The tenor of plaintiff's motion for reargument is that the Court found Union Carbide committed fraud on the patent office:

[B]ecause of the serious nature of this finding, and Carbide's continuing belief that the prosecution of the patents in suit was wholly proper and that the Court has erred in finding fraud, reargument is respectfully requested. Plaintiff's Motion for Partial Reargument of Dow's Motion to Compel, Dkt. 64 at 1. The Court made explicit that it had not found fraud:

It must be emphasized that the Court today decides only that there is a prima facie showing of fraud on the patent office and not that there has been actual fraud. The Court's as-

Plaintiff suggests that the Court's finding of prima facie proof of fraudulent conduct is in conflict with the decision of the Court of Appeals for the Federal Circuit in *Kimberly-Clark v. Johnson & Johnson,* 745 F.2d 1437 (Fed.Cir.1984). Plaintiff cites *Kimberly-Clark* for the proposition that where the same examiner reviewed two applications, the patent office is charged with the duty of knowing the contents of each. Since the patent applications at issue in this litigation were reviewed by the same examiner, Carbide argues that a finding of fraud is improper.

*Kimberly-Clark* is, however, inapposite. In that case, the court merely held that inequitable conduct could not be premised upon the patentee's *"nonfeasance* consisting of a failure to disclose known prior art" that was material only to claims which had been rejected by the patent examiner as unpatentable. *Id.* at 1457 (emphasis added). Under those circumstances, the court concluded that the patent examiner had the duty of knowing the contents of both applications so as to be sure they claimed distinct inventions. The Court finds nothing in the *Kimberly-Clark* opinion which would similarly excuse what prima facie appears to be an intentional misrepresentation,[2] rather than an omission, of information which was material not to disallowed claims, but to the decision to issue the patents in question. Moreover, while the patent examiner may have a duty to know of the contents of co-pending applications which he or she was responsible for reviewing, that duty would be vitiated by the fact that in this case the Kuryla application was already abandoned at the time that Kuryla filed affidavits with the patent office in conjunction with the procurement of the Stamberger patents. Consequently, the *Kimberly-Clark* case is unavailing to plaintiff on these facts.

An order will be entered denying plaintiff's motion for partial reargument.

sessment of the latter issue must await trial on all the evidence.
*Union Carbide Corporation v. The Dow Chemical Company,* 619 F.Supp. 1036, (De.1985), Civil Action No. 83–208 MMS, slip op. at 31, note 15.